E-FILED
Wednesday, 09 June, 2021  08:56:05 PM
Clerk, U.S. District Court, ILCD

# Exhibit A

Page 1

1          IN THE UNITED STATES DISTRICT COURT
           FOR THE CENTRAL DISTRICT OF ILLINOIS
2
   DWIGHT LONG,                        )
3                                      )
                   Plaintiff,          )
4                                      )
   vs.                                 ) No. 19 CV 3195
5                                      )
   TERRY MARTIN, et al.,               )
6                                      )
                   Defendants.         )
7
8                    The Deposition of DWIGHT LONG,
9    called by the Defendants for examination, pursuant
10   to Notice and pursuant to the Federal Rules of Civil
11   Procedure for the United States District Courts,
12   taken before Victoria D. Rocks, CSR, and Notary
13   Public in and for the County of Cook, State of
14   Illinois, commencing at 10:00 o'clock a.m. on the
15   22nd day of February 2021, A.D.
16
17
18
19
20
21
22
23
24

**Page 2**

1 APPEARANCES:
2
     MR. DWIGHT LONG,
3
     appeared pro se;
4
5    MS. ABIGAIL E. DEHART
     ASSISTANT ATTORNEY GENERAL
6    100 W. Randolph Street
     Suite 1300
7    Chicago, Illinois 60601
     (312) 814-0996
8    adehart@atg.state.il.us
9    appeared on behalf of the Defendants,
     Terry Martin, Stephanie Howard and
10   Kimberly Barbee;
11   CASSIDAY SCHADE, LLP
     MR. BRADLEY J. TAYLOR
12   111 North 6th Street
     Suite 200
13   Springfield, Illinois 627O1
     btaylor@cassiday.com
14
15   appeared on behalf of the Defendant,
     Dr. Kayira.
16
17
18
19
20
21
22
23
24

**Page 3**

1            I-N-D-E-X
2
3
   WITNESS: DWIGHT LONG
4
5 Direct Examination by MS. DeHART:    5 - 39
   Cross-Examination by MR. TAYLOR:    39 - 99
6 Redirect Examination by MS. DeHART:  99 - 103
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1      (Witness sworn)
2     MS. DeHART:  We are here in the case of Long
3 versus Martin.  The case number is 19-3195 pending
4 in the U.S. District Court for the Central District
5 of Illinois.
6      We're on Zoom for the deposition of plaintiff
7 in this matter, Mr. Dwight Long.  So Mr. Long, as I
8 said, my name is Abigail DeHart.  I represent the
9 Illinois Department of Corrections.  Is it okay if I
10 use IDOC for short?
11    THE WITNESS:  Yes.
12    MS. DeHART:  So I represent IDOC defendants
13 Terry Martin, Stephanie Howard and Kimberly Barbee
14 and also here is Mr. Taylor, and he could introduce
15 himself.
16    MR. TAYLOR:  How are you doing, Mr. Long.
17    THE WITNESS:  I'm fine.  How are you?
18    MR. TAYLOR:  I'm doing well.  Thank you for
19 asking.  As Ms. DeHart noted, I'm Brad Taylor.  I am
20 representing Dr. Kayira in this matter.  Okay?
21    THE WITNESS:  Yes, sir.  I understand.
22    MS. DeHART:  So I am going to start off and ask
23 you questions and then I will turn it over to
24 Mr. Taylor.

**Page 5**

1      Before we get started, I want to ask you,
2 you understand that I don't represent you, correct?
3     THE WITNESS:  Yes, ma'am.  I represent myself.
4     MS. DeHART:  Yes.  I just wanted to make sure
5 of that.  And are you on a tablet or a phone or is
6 it a computer so I know if I put up some exhibits?
7     THE WITNESS:  I guess this is a tablet.
8     MS. DeHART:  I understand.  Sometimes they're
9 kind of small.  So I have a couple of exhibits that
10 I will put up on the screen so we could walk through
11 that if it's hard to see.
12         DWIGHT LONG,
13 called as a witness herein, having been first duly
14 sworn, was examined upon oral interrogatories and
15 testified as follows:
16         DIRECT EXAMINATION
17       BY MS. DeHART:
18   Q.  So first I am going go through some
19 preliminary background information.  First question
20 is have you ever given a deposition before?
21   A.  No, ma'am.
22   Q.  So just to go over some basic housekeeping
23 rules.  Part of it is it's a little difficult
24 because this is over Zoom.  So I will try to speak

Page 6

1 slowly.
2        Definitely if I ever ask something that
3 is confusing or you don't understand or I'm talking
4 too fast, feel free to tell me you don't understand.
5 I could rephrase.  And especially because we're over
6 Zoom there could be some internet connection issues,
7 but for the court reporter we'll try to be clear.
8        In a deposition if I ask you a question,
9 I am going to ask that you answer with verbal yes or
10 no rather than uh-huh or nodding your head, which
11 can be hard to remember because it's not how we
12 normally speak in person.
13    A.  I understand.
14    Q.  Any questions about some of the things
15 that we have discussed so far or this deposition?
16    A.  What about it?
17    Q.  Just any questions before we go ahead.
18    A.  Do I have any questions?
19    Q.  Yes.
20    A.  No.
21    Q.  Do you understand you have taken an oath
22 to tell the truth today?
23    A.  Yes, ma'am.
24    Q.  I ask everyone this before we go in a

Page 7

1 deposition, but is there any reason you cannot tell
2 the complete truth today, whether that be
3 medication, illness, tiredness, inability to see a
4 screen or anything?
5    A.  I am doing fine.
6    Q.  Great.  Why have you brought this lawsuit?
7    A.  I was assaulted by Terry Martin.
8    Q.  And generally what do you hope to gain
9 from this lawsuit?
10    A.  Well, it's not to gain anything.  It is to
11 make sure that this doesn't happen anymore, and the
12 pain and suffering I've gone through.  I think that
13 these things should be dealt with.
14    Q.  We could go a little more into that later
15 as far as damages and what you hope to happen at the
16 end of it.
17        Did you review any documents to prepare
18 for this deposition today?
19    A.  No, only what I have from you and
20 Mr. Taylor, and the complaint that was written by
21 me.  And those paperworks that I have sent to
22 lawyers for the defendants.  And the amended
23 complaint and different paperwork and documents like
24 that.

Page 8

1    Q.  So the paperwork generally related to this
2 complaint?
3    A.  Yes.
4    Q.  And the events that you talk about in the
5 complaint you mention, those all took place at the
6 Graham Correctional Center in Hillsboro, Illinois,
7 correct?
8    A.  Yes, ma'am.
9    Q.  And the lawsuit is only about what
10 happened at the Graham Correctional Center?
11    A.  Yes.
12    Q.  Generally, what is the time period about
13 which you are suing, generally what year to what
14 year?
15    A.  Well, I don't understand that question.
16 But I could explain it to you like this.  When it
17 happened, I filed a grievance, and I also filed
18 assault charges with different people, as you'll see
19 in the paperwork that I have written.  And that is
20 about the size of it.
21    Q.  We could go a little more in depth.  It
22 will be helpful to have some of the paperwork that
23 you're talking about, which I could put up on the
24 screen.

Page 9

1        Some more kind of basic background
2 information.  Can you say and spell your full name
3 for the record.
4    A.  Dwight, D-w-i-g-h-t.  Long, L-o-n-g.
5    Q.  What is your IDOC number?
6    A.  S15203.
7    Q.  Have you been known by any other names?
8    A.  I have a middle name Donnell,
9 D-o-n-n-e-l-l, but I haven't used that since I've
10 been in prison.  It's been Dwight Long.
11    Q.  So you usually go by Dwight?
12    A.  Yes.
13    Q.  What is your birthdate?
14    A.  October 18, 1951.
15    Q.  And your highest level of education?
16    A.  I spent 14 years.  I did a couple of years
17 of college.
18    Q.  Do you have a job at this prison at
19 Graham?
20    A.  Not right now.
21    Q.  In the past?
22    A.  Yes, in the past.
23    Q.  What cell are you currently housed in?
24    A.  Unit 23.  The cell number is D6.

3 (Pages 6 - 9)

Page 10

1    Q.  And how long have you been in the cell?
2    A.  I think we have been there now three
3  weeks.  We've been moving around a lot because of
4  the pandemic.
5    Q.  I understand.  Do you have a cell mate?
6    A.  Yes, I do.
7    Q.  Who is that?
8    A.  I don't really know his name.  He just
9  came in there a couple of days ago.  People tell you
10  the names, they got all these nicknames.
11    Q.  Where were you before this cell?
12    A.  Housing unit 21, but I don't remember the
13  cell number because we moved about maybe ten times
14  in the last couple of months.  So I have no idea.
15    Q.  That makes sense.  We don't really have to
16  go into that because I know you've probably been
17  moving a lot.
18       Have you spent time at other
19  institutions besides Graham?
20    A.  Yes.
21    Q.  Which one?
22    A.  Lawrence Correctional Center before I came
23  here.
24    Q.  Just that?

Page 11

1    A.  That's it.
2    Q.  Why were you transferred from Lawrence?
3    A.  Probably because of good behavior, and I
4  was able to do a lot of things.  I go to a lot of
5  classes.  I do a lot of work since I've been in
6  prison, and I was able to transfer here.
7    Q.  What date do you remember approximately
8  the year that you moved to Graham?
9    A.  It was around September of 2016.
10    Q.  And then you've been at Graham ever since?
11    A.  Yes.
12    Q.  Some more background about you.  Do you
13  have any prior lawsuits against either the State of
14  Illinois or IDOC?
15    A.  No.
16    Q.  So this is your first lawsuit against
17  IDOC?
18    A.  Yes.
19    Q.  Again, a little more background
20  information.  Have you ever been housed in the
21  segregation unit at Graham?
22    A.  Yes.
23    Q.  For what reason?
24    A.  Hunger strikes.

Page 12

1    Q.  Hunger strikes?
2    A.  Hunger strikes, yes.  Amongst other
3  things.  I don't remember everything.
4    Q.  We could go into that a little more with
5  some paperwork.  Now, I will get a little more
6  particular about this case now that the background
7  is out of the way.
8       When you first entered IDOC, either at
9  Lawrence or Graham, did you receive an inmate
10  handbook?
11    A.  Yes.
12    Q.  At Graham did you receive an inmate
13  handbook?
14    A.  Yes, and at Lawrence.
15    Q.  Did you sign something acknowledging you
16  received the inmate handbook?
17    A.  I don't remember at this time.
18    Q.  Are you generally familiar with the inmate
19  handbook?
20    A.  Pretty much.
21    Q.  Have you heard the word grievance before?
22    A.  Yes, I have.
23    Q.  And generally what is a grievance?
24    A.  When something is done that may be against

Page 13

1  you, we will file a grievance.  That is how it is
2  done in prison.  Something done against us, that is
3  a way for us as prisoners to express ourselves.
4    Q.  Can you describe generally the process of
5  how you go about filing a grievance?
6    A.  Once I write the grievance, it's usually
7  given to a counselor.  The counselor looks at it,
8  and they will send it to who I am grieving about.
9       And it will go to them, come back to me
10  and tell me what they said, whether I like it or
11  not.  I send it to the grievance officer.  Once the
12  grievance officer looks at it and the CAO, which is
13  the warden, then I'll send it to Springfield for
14  them to be exhausted through their remedies, and
15  they will send it back to me.
16    Q.  How do you know that is the process, from
17  the inmate handbook?
18    A.  Pretty much.  And talking to other inmates
19  that have been here longer than me that know certain
20  things, know the law and know different things.
21    Q.  Did you file a grievance at IDOC?
22    A.  Yes, I did.
23    Q.  Do you know approximately how many you
24  filed?

4 (Pages 10 - 13)

Page 14

1    A.  Outside of this one?
2    Q.  Yes.
3    A.  No, I don't.
4    Q.  Then did you file a grievance related to
5 the allegations in this complaint that is the topic
6 of this lawsuit?
7    A.  Yes.
8    Q.  And which grievance or grievances do you
9 say are at the basis of this lawsuit?
10   A.  I don't understand your question.
11   Q.  Essentially which grievance is the topic
12 of the lawsuit you are bringing today? What do you
13 base this lawsuit on?
14   A.  On being assaulted.
15   Q.  And you filed a grievance about that?
16   A.  Also in how my medical needs were not
17 being taken care of.
18   Q.  How many grievances did you file about
19 that that you are bringing in this lawsuit today?
20   A.  One.
21   Q.  Just one?
22   A.  Yes.
23   Q.  So we could go through, we're going to try
24 the exhibit thing. I am going to try to share the

Page 15

1 screen. We'll see if it works.
2      Like I said, if it is not easy to read
3 we could try to work something out. Do you see this
4 on the screen?
5   A.  Yes, I do.
6   Q.  Great. Perfect. Now, to get a little
7 more particular I have on the screen a grievance.
8 Is this a grievance you wrote on April 28, 2017?
9   A.  Yes, it is.
10   Q.  I am going to scroll down so you could see
11 everything that I am including here.
12   A.  I am very familiar with it.
13   Q.  I figured. So generally what is this
14 grievance about?
15   A.  About being assaulted. And the issues I
16 was having before the assault medically.
17   Q.  Is this the grievance that formed the
18 basis of the lawsuit you are bringing today?
19   A.  Yes.
20   Q.  Which defendants did you name in this
21 grievance?
22   A.  Terry Martin. And at the time I wasn't
23 here that long at this prison, I really didn't know
24 the names of the other people until later.

Page 16

1   Q.  Understood. Generally, can you explain in
2 your own words what happened on April 19, 2017 that
3 led you to write this grievance?
4   A.  I'm pretty sure it is self explanatory.
5   Q.  Can you just describe to me the events
6 just so I could get your own words of them. I know
7 it's written here, but I also just want to hear from
8 your own words a little more background of it.
9   A.  I will read something to you.
10   Q.  Okay. Is this something you prepared for
11 today, a written document?
12   A.  These documents were sent to everyone that
13 is in the lawsuit. This is the 1983 complaint, and
14 everybody that is involved in it, I sent a package.
15   Q.  We do have those packages. So I have read
16 those documents. I will ask you some more
17 particular questions.
18      I am not trying to be difficult or make
19 you repeat yourself, but some of this deposition is
20 to get you to say in your own words for the record
21 what happened.
22   A.  I would rather stick to what I have
23 written because I don't want to give any assumption
24 that I planted something in this or put some more in

Page 17

1 here or taken something out of it.
2      I want to stick with what I have done
3 from day one.
4   Q.  Generally, can you explain what the reason
5 was, it says you went to health care on April 19,
6 2017.
7      Can you explain to me why you went to
8 health care that day?
9   A.  I was still having problems with urinating
10 blood.
11   Q.  And you say there was an argument between
12 yourself and some health care personnel.
13      Do you recall now which health care
14 personnel you were having arguments with?
15   A.  Yes, Terry Martin and Kimberly Barbee.
16   Q.  And what exactly what was said in those
17 arguments?
18   A.  Well, I put it in the paper. It's in
19 there.
20   Q.  Okay. So after you went in and let's see.
21 You went in, and you spoke with medical personnel.
22 And then what do you contend happened?
23   A.  Exactly what was said in the complaint, in
24 the grievance. I'm not trying to be smart or

5 (Pages 14 - 17)

Page 18

1 anything.  I like to stick to what's already been
2 said because nothing is going to change.
3     Q.   So it says health care personnel.  They
4 act as though what is wrong with you is not serious.
5 And then you contend an assault happened.
6         So I will scroll down here.  Can you
7 explain to me, whether it's through this document or
8 your own words, what exactly the assault was?
9     A.   What do you mean, what the assault was?
10    Q.   Can you explain what happened during the
11 assault that you allege happened?
12    A.   Well, just like I said.  He picked me up
13 and body slammed me in a wheelchair.  I was laying
14 on the ground hurting.
15        I was bleeding, and my stomach was
16 bloated from urine backing up and blood backing up
17 into my system, and nothing would come out.
18    Q.   And here it says the male commander.  It
19 says the male CMT.  Who is that?
20    A.   Terry Martin.
21    Q.   Who else was there when this allegedly
22 happened?
23    A.   A nurse by the name of Nancy Springer.  A
24 nurse named Mary.  I still don't know her name

Page 19

1 because I haven't gotten any discovery from the
2 defendants yet.  And I have asked to compel that,
3 and I haven't seen any.
4     Q.   Hang on.  There is some background noise
5 from the people around you.  I want to make sure I
6 can hear you.  Say that again.
7     A.   What part?
8     Q.   I asked who else was there.
9     A.   Nancy Springer.  A nurse named Mary.
10 Terry Martin.  That's why I said I have to go to my
11 notes because I don't remember all these people's
12 names.
13    Q.   I totally understood.
14    A.   A CO named White.  I still don't know his
15 first name.  There was Stephanie Howard.  T. Maske.
16 And right now that is it, the ones that were in
17 there.
18    Q.   Then going back to this grievance.  Let's
19 talk a little bit through the process to make sure
20 this is clear for the record.
21        After you filed this grievance it looks
22 like on April 28, then what did you do next?
23    A.   I have to wait for the process.
24    Q.   Did you receive a response from the

Page 20

1 counselor?
2     A.   I received -- her name is Laurie Bergbaur
3 (phonetic).  I received it May 29, 2017.
4     Q.   After you received this response from the
5 counselor, what did you do?
6     A.   I sent it to the grievance officer.
7     Q.   Did you receive a response from the
8 grievance officer?
9     A.   Yes.
10    Q.   I am going to pull up another exhibit.
11 This is the grievance officer's response, correct?
12    A.   Yes.
13    Q.   So after you received this response, what
14 did you do next?
15    A.   Scroll up, and it will tell you.
16    Q.   Can you say that one more time?
17    A.   Can you scroll it up.
18    Q.   Yes.
19    A.   It went to the chief administrator officer
20 who is the warden, Warden Foster.  And it was turned
21 back on 14 July 17.
22        Then I appealed to the director on 31
23 July 17.  It was sent to Springfield, Illinois for
24 review.

Page 21

1     Q.   Then what happened after that?
2     A.   The incident, as we know, occurred on
3 4-19-2017.  The grievance was written on 4-28, I
4 believe.  You had it up there, 4-28-17.
5         I sent it to Springfield.  They said
6 they received it on 7-24-17.  They had a hearing
7 date on 8-29-17.  And they said they mailed it back
8 to me September 5, 2017, but to today I haven't
9 received it.
10        And I inquired about it to the
11 counselor, Ms. Laurie Bergbaur, and she said that
12 your next contact with Dwight, could you please
13 relate to him the following from our office.  We
14 have received his March 14, 2018 letter regarding
15 claims he hasn't received a response from our
16 office, which is Springfield, from his July 27
17 submission.
18        Our office does not provide additional
19 copies.  That is what it said.  That's why I don't
20 have a copy of it, and I'm sure in your responses
21 that you sent to me and your interrogatories, you
22 know, you all said that I didn't exhaust my
23 remedies, but I have.
24    Q.   So you said you did not receive the ARB

6 (Pages 18 - 21)

Page 22

1 response?
2    A.  Yes.
3    Q.  So I'm going to move on.  I will take this
4 down.  So still related to this incident that you
5 wrote the grievance about, did you also receive a
6 ticket for the incident that happened on April 19,
7 2017?
8    A.  Yes, I did.
9    Q.  So it looks like there was a hearing on
10 the 22nd.  Were you at the hearing?
11    A.  Yes.
12    Q.  And what was it about generally?
13    A.  They were explaining to me that I was
14 insolent because I had an argument with him, and I
15 disobeyed a direct order, which I went to see the
16 doctor.  I was urinating blood.  I was very sick at
17 the time.  This is what they did.
18    Q.  So the hearing on the 22nd about the
19 incident that happened on April 19, 2017,
20 essentially it was about the issues you were
21 bringing in your complaint about that incident?
22    A.  The ticket had nothing to do with the
23 complaint.
24    Q.  What was the ticket?

Page 23

1    A.  What happened to me is what happened that
2 was put in the complaint when I was assaulted and
3 not given medical care by health care.  Prison
4 health care, that is what this is concerning.
5    Q.  What was the hearing about, do you recall
6 what was discussed at it and what the allegations
7 against you were?
8    A.  That is self-explanatory.  This is what
9 they said.  No matter what I said, this is what they
10 said.
11    Q.  And so after you got a ticket from this
12 incident, then you filed your grievance on April 28?
13    A.  No.  I didn't have anything.  The ticket
14 had nothing to do with the grievance.
15    Q.  Understood.  But it was after this
16 hearing, then you filed your grievance on
17 April 28th?
18    A.  I'm pretty sure that was, correct.  You
19 have to understand one thing.  We're in prison.
20 They don't succomb to us every time we ask them
21 something, meaning that that's the date.  The ticket
22 was on the 22nd.  The grievance was filed on the
23 28th, and I was sick.
24       The same day I was assaulted.  I had to

Page 24

1 be taken back into the infirmary.  The next morning
2 I was taken to a hospital to deal with the urinating
3 of the blood even after I was assaulted.
4    Q.  Okay.  So I will take this down.  And
5 let's see.  I'm going to pull up another grievance.
6 Can you see this one?
7    A.  Yes, I can.
8    Q.  Is this the grievance you wrote on
9 April 11, 2017?
10    A.  Yes.
11    Q.  And can you explain generally what this
12 grievance is about?
13    A.  It was dealing with the health care that I
14 wasn't getting when I came back from the prison.
15 The doctor that did the surgery in Effingham
16 explained to them what the procedures were to be
17 done following the surgery, which they did not do.
18 And I continued to urinate blood.
19    Q.  And which defendants did you name in this
20 grievance?
21    A.  I don't remember because I don't have that
22 in front of me.  If you scroll it up, I'm pretty
23 sure they'll have some names in there.
24       Go back to the first page.  Okay, it's

Page 25

1 right there.  This is just explaining to them what
2 had happened as far as what was going on with
3 urinating of the blood.  No defendant is named in
4 there because, like I said, I didn't know anybody's
5 name at the time.  And now I know.
6    Q.  Did you receive a response from the
7 counselor?
8    A.  Yes, April 19, 2017.
9    Q.  And then after you received a response
10 from the counselor, what did you do next?
11    A.  I don't remember.  Scroll it up again.
12 Right there, I made it as an emergency grievance,
13 and Warden Foster said it wasn't an emergency when I
14 was urinating blood, and I'm not a young man.
15       I was in my 60s, like I am now.  And I
16 don't know when urinating blood, what country it's
17 not serious in, but it's pretty serious to me.
18    Q.  So I am going to pull up, let's see.
19 After you received the response from the counselor,
20 I'm going to pull up the next document.
21       So this looks to be the grievance
22 officer's report in response to your April 11th
23 grievance?
24    A.  Uh-huh.

7 (Pages 22 - 25)

Page 26

1    Q.   And what date did you receive this?
2    A.   I don't remember, but it should be
3 June 14, 2017.
4    Q.   So the grievance was deemed moot.  And
5 after this then what did you do next?
6    A.   I sent it to the chief administrative
7 officer.  He sent it back on the 22nd of June, 2017.
8 That is what it says.  And I don't know what the
9 next step was.  If I hadn't sent it to Springfield,
10 that would be the next step.
11    Q.   We have two other documents relating to
12 this.  So do you recall this one?
13    A.   Yes.  That's the response from
14 Springfield.
15    Q.   What did they say back?
16    A.   They are saying that included in the
17 grievance the ROT administrator in a response, they
18 didn't do it in a timely manner, like I said.  This
19 prison does what they want with the grievances.
20 They hold them as long as they want to, and there's
21 nothing we could do about it.  That is the size of
22 it.
23    Q.   So you got this returned back to you.  Do
24 you recall what you did next after that?

Page 27

1    A.   No, I don't.
2    Q.   I have one more document related to this.
3 Can you see this document?
4    A.   Yes.
5    Q.   It looks like this was another
6 Administrative Review Board response to your
7 April 11, 2017 complaint.  Do you recall this
8 document?
9    A.   Yes.
10    Q.   I will scroll so you could see it.  Did
11 you try to submit it again?
12    A.   Yes, I did.
13    Q.   And what did they say back after that?
14    A.   It's on the bottom.  It said over 60 days
15 to grievance officer.  Sent to HRB.  First versus
16 facility.
17        So that tells you right there what I
18 just explained to you.  They hold these grievances
19 no matter what.  Like right now I have a mini
20 grievance.  It's in health care that was submitted
21 in December.  They still haven't -- I haven't seen
22 it yet.  This is what they do.  They play games with
23 us here and that's what they do.
24    Q.   I will stop sharing that document.  And I

Page 28

1 have one more document to go through with you about
2 the grievances.
3        So is this a grievance you wrote on
4 April 14, 2018?
5    A.   Yes, it is.
6    Q.   And what is this grievance about?
7    A.   That grievance is in conjunction with the
8 grievance on 4-19-17.  The incident that happened on
9 4-19-17.
10    Q.   Which defendants were named in this
11 grievance?
12    A.   Terry Martin.
13    Q.   And did you receive a response from the
14 counselor?
15    A.   I received a response from the director of
16 nurses, Stephanie Howard.
17    Q.   What did she say?
18    A.   She said, "I read your grievance.  It is
19 noted that the first surgery you received related to
20 a second surgeon for your shoulder issue.
21        After reviewing the chart it appears the
22 second surgeon has offered for you to continue an
23 exercise program, and he will follow up with you in
24 four weeks.  Your health care needs are being met."

Page 29

1    Q.   So you received this response and then
2 what did you do after that?
3    A.   I don't remember.
4    Q.   I think I have one more document.  Let's
5 see.  So it looks like then you went and submitted
6 it to the counselor and eventually to the
7 Administrative Review Board.  Do you recall that?
8    A.   Yes.
9    Q.   Do you recall how they responded?
10    A.   The Administrative Review Board received
11 the appeal 30 days past due of the Chief
12 Administrator's office decision.  Therefore, the
13 issue will not be addressed further.
14        That was the issue on the first
15 grievance O5O372017.  The office previously
16 addressed the issue on 8-29-2017.
17    Q.   And these are also documents you submitted
18 at the time?
19    A.   Yes.  I wrote a letter to the director of
20 IDOC at that time who was Mr. John Baldwin.
21    Q.   And this was the grievance officer's
22 report from that complaint or grievance?
23    A.   Yes.
24    Q.   It looks like you submitted it on

Page 30

1 December 1, 2018.  Or you signed it December 1,
2 2018?
3     A.   Yes.
4     Q.   And the the Administrative Review Board
5 received it on December 13th?
6     A.   Yes.
7     Q.   Did you submit it right after you signed
8 it or were there a couple of days lagging between?
9     A.   I don't remember.  Like I said, again, the
10 grievance process here at this prison is kind of
11 messed up.  They don't follow the rules.
12    Q.   But you don't recall if you submitted it
13 right after you signed it?
14    A.   No, I don't.
15    Q.   I am going to stop sharing those
16 documents.  I have a couple of general questions,
17 and I apologize if some of this is going to be a
18 little repetitive.  Sometimes depositions are a
19 little repetitive.  So I apologize.
20    A.   I have no problem with that.  That's why
21 I'm here.
22    Q.   I appreciate that.  We're going to go
23 through each of the IDOC defendants, and I am going
24 to ask you some questions about them.

Page 31

1         So the three defendants I represent:
2 Terry Martin, Kimberly Barbee and Stephanie Howard,
3 are you familiar with these three people?
4     A.   Yes, I am.
5     Q.   So I am going to start with Terry Martin.
6 Who is Terry Martin?
7     A.   He used to work here as a CMT.
8     Q.   Why did you sue him?
9     A.   It's in the complaint.
10    Q.   So based on the things you put in the
11 complaint is why you sued him?
12    A.   Yes.
13    Q.   And is that the only reason you sued him?
14    A.   What else more is there?
15    Q.   Does he know you?
16    A.   He knows me probably when he sees me, yes.
17 We have some 1700 prisoners.  So I don't know if he
18 remembers me.  I'm pretty sure he remembers what he
19 did to me, let's put it that way.
20    Q.   Besides the incident on April 19, 2017,
21 have you had more interactions with Terry Martin?
22    A.   Yes.  When I was urinating blood, I was in
23 the infirmary, and he came back and wanted to apply
24 lidocaine on my penis, but it wouldn't go in.  And

Page 32

1 that's about the last time I had any dealings with
2 him.
3     Q.   Going back to April 19, 2017 and now this
4 may seem like a silly question, but what do you
5 contend Terry Martin should have done differently on
6 the day when you went in to ask for medical help?
7         What do you contend he should have done
8 differently?
9     A.   What he should have done?
10    Q.   Yes.
11    A.   I can't speak for him.  I don't know his
12 intentions.
13    Q.   Are there any other communications you've
14 had with Terry Martin that you haven't told me about
15 the best that you can recall?
16    A.   No.
17    Q.   So now, Kimberly Barbee.  Who is Kimberly
18 Barbee?
19    A.   She is also a CMT.  She doesn't work here
20 anymore, like he doesn't.
21    Q.   Why did you sue her?
22    A.   Because she was totally indifferent to my
23 medical grievance.  They knew what was wrong with
24 me, and they didn't do anything.

Page 33

1     Q.   Was she in the room on April 19, 2017?
2     A.   Yes, she was.  She was the one that wrote
3 the ticket.
4     Q.   Have you had further interactions with
5 Ms. Barbee?
6     A.   Probably off and on before she retired
7 because I go to health care for these issues.  And I
8 am still having issues now.
9     Q.   So you have seen her since for continued
10 medical health care?
11    A.   It's been a year or so now because she
12 retired.
13    Q.   Did you have frequent interactions with
14 her then?
15    A.   No.
16    Q.   Stephanie Howard, lastly.  Who is she?
17    A.   She's the director of nursing.
18    Q.   And why did you sue her?
19    A.   She knew what her staff was doing.  She's
20 in control of what they do.  She makes the policies
21 for them, and she stood by and did nothing.
22    Q.   Was she also in the room on April 19th?
23    A.   Yes, she was.
24    Q.   Have you had many interactions with her?

9 (Pages 30 - 33)

Page 34

1  A.  More than Terry Martin and Kimberly
2 Barbee, yes.
3  Q.  About how many times?
4  A.  I have no idea.
5  Q.  What is the most recent time you've spoken
6 with her if you can recall?
7  A.  It's been a few weeks now.  They came by
8 and asked me if I want the vaccine for the Covid.
9 That is the last time I spoke to her.
10  Q.  So going a little more particularly into
11 your complaint and the reason for this case today,
12 do you have a copy of your complaint with you?
13  A.  Yes, ma'am, I do.
14  Q.  I will also put it up on the screen so we
15 are all working off the same document.  So the first
16 complaint that was filed, I will pull them both up
17 and then the amended complaint.
18   So first I will pull up, so this is the
19 first complaint you filed.  Do you have a copy of
20 this first complaint you filed?
21  A.  Yes, I do.
22  Q.  And you recognize this document up on the
23 screen?
24  A.  Yes, ma'am.

Page 35

1  Q.  And did you write this complaint?
2  A.  Yes, ma'am.
3  Q.  And let's see.  I will also pull up the
4 amended complaint that was filed December 1, 2020.
5   Did you also write this complaint?
6  A.  Yes, ma'am.
7  Q.  Are there any other documents related to
8 your complaint that you haven't attached to either
9 the first or this amended complaint?
10  A.  Say that again.
11  Q.  Are there any other documents related to
12 your case that are not attached to these complaints
13 that you filed?
14  A.  Yes.  I have an amended grievance that was
15 sent to health care on December 28, if I'm not
16 mistaken, and I haven't received an answer from them
17 yet from anyone.
18  Q.  And you said December 28 of this year.  So
19 2020?
20  A.  Yes, 2020.
21  Q.  So you submitted a grievance, but haven't
22 received the counselor's response you're saying?
23  A.  No, I never received it.
24  Q.  Besides that grievance, are there any

Page 36

1 other grievances you contend that are related to
2 this particular lawsuit?
3  A.  No, not that I'm aware of.
4  Q.  So the April 19th grievance and then this
5 most recent December 28th grievance are the two that
6 you contend are the basis of this lawsuit?
7  A.  Pretty much.
8  Q.  I have a couple more questions for now.  I
9 know you said when I asked you what are you seeking
10 from this lawsuit and what do you want from this
11 lawsuit.
12   Essentially, again, what kind of relief
13 or damages are you looking for from this lawsuit?
14  A.  Well, I will read it from my relief
15 requested.  Is that okay with you?
16  Q.  That is okay with me, yes.
17  A.  I said I did not receive adequate or
18 timely treatment for urinating blood or when my back
19 and right shoulder were injured by CMT Terry Martin.
20   I have been subjected to pain and
21 suffering with no penal justification in violation
22 of the United States Constitution, 8th Amendment.  I
23 feel that for the damages, pain and suffering I
24 sustained, I ask the Court for damages in the amount

Page 37

1 of $300,000.  Which I have changed since then
2 because I have had a second -- I had to have my
3 shoulder replaced after the first surgery.  I am
4 asking for $700,000.
5  Q.  And the $700,000 in relief, sorry, I know
6 you said this, but just specify.  That is because of
7 your shoulder and what are the other things
8 particularly?
9  A.  My back was injured, and I was urinating
10 blood at the time which I was assaulted by Terry
11 Martin.
12  Q.  So shoulder, back, urinating blood?
13  A.  Uh-huh.
14  Q.  And anything else?
15  A.  Well, like I said, I have sent a lot of
16 documents to you all and if you read them, it talks
17 about how I was treated after I came back for four
18 different surgeries for my urinary tract.
19   They didn't give me the medications that
20 the doctor specified from the hospital.  And every
21 time they didn't give it to me, I had to go back to
22 the hospital urinating blood.
23   The fifth time I went to the hospital I
24 told the doctor in front of the officers that took

10 (Pages 34 - 37)

1 me up there, every time you send me back to the
2 prison, they do not do what you tell them to do
3 medically.  That is why I'm urinating blood again.
4        He told me you're not going anywhere
5 this time.  You'll stay here with me, and we'll fix
6 it.  I haven't urinated blood since that day.
7    Q.   And do you recall what day that was?
8    A.   No.
9    Q.   We may have some documents that we'll ask
10 you about later on.
11   A.   You all have asked me to send you reports
12 from the hospitals, and I have submitted those to
13 them.  And, obviously, they sent them because I have
14 certified mail receipts showing that they got it.
15   Q.   Okay.  Any other relief requested from the
16 lawsuit?  So the damages you said in the amount of
17 $700,000?
18   A.   Yes.  And whatever that deals with.  If
19 it's compensatory or however the judge sees it, how
20 the courts look at it, that's all.  That's all I'm
21 asking for.
22      MS. DeHART:  I am going to turn it over to
23 Mr. Taylor, who is going to ask you some questions.
24 And I might come back and ask you some more after

1 he's done.  But I will turn it over to him.  Thank
2 you for your time.
3      THE WITNESS:  Thank you.
4          CROSS-EXAMINATION
5          BY MR. TAYLOR:
6    Q.   Good morning, Mr. Long.  I know we did the
7 introduction, but I want to remind you that I am the
8 attorney representing Dr. Kayira in this case.
9 Okay?
10   A.   I understand.
11   Q.   Great.  Do you need a break, sir?  We
12 could take a break.
13   A.   No, I don't need a break.
14   Q.   Okay.
15   A.   I prepared myself for this.
16   Q.   You understand I am Dr. Kayira's attorney
17 in this case, and I am not representing you, sir?
18   A.   Yes.
19   Q.   You also understand that you are still
20 under oath and giving testimony?
21   A.   Yes, sir.
22   Q.   Now, I know you said you don't need a
23 break, but if anything changes let me know and we
24 could take a break.

1    A.   Okay, I sure will.
2    Q.   The only thing I ask is if I ask a
3 question and it's pending, that you answer the
4 question before we go on break.
5    A.   Okay.
6    Q.   I'm going to go back into some background
7 questions.  I know that Ms. DeHart did.  I represent
8 different defendants.  So some things are different
9 and relevant.
10      She hit on this, but you are currently
11 incarcerated within the IDOC, correct?
12   A.   Correct.
13   Q.   And you're currently incarcerated at
14 Graham Correctional?
15   A.   Yes, sir.
16   Q.   Are you currently facing any outstanding
17 felonies or misdemeanor charges?
18   A.   Only what I'm here for.
19   Q.   Are you aware of any warrants outstanding
20 from other states?
21   A.   There's none.
22   Q.   You said there's none?
23   A.   None.  If it is, I have no idea what they
24 are.

1    Q.   Understood.
2    A.   I'm not an in and out of prison person, if
3 that makes sense to you.
4    Q.   Yes, sir, it does.  I know she asked you
5 about filing previous suits.
6        Have you ever filed a civil suit before,
7 sir?
8    A.   No.
9    Q.   So this is your first?
10   A.   First.
11   Q.   Have you ever been convicted of a crime or
12 misdemeanor involving dishonesty or fraud?
13   A.   No.
14   Q.   Have you ever been disciplined within IDOC
15 for lying to an officer?
16   A.   No.
17   Q.   This is going to be seem like a stupid
18 question, but we have to get it on the record.  You
19 could read and write English, correct?
20   A.   Yes.
21   Q.   Are you fluent or proficient in any other
22 languages?
23   A.   No.
24   Q.   You said your highest level of education

11 (Pages 38 - 41)

Page 42

1 is two years of college?
2    A.  Yes.
3    Q.  Did you receive your associates degree,
4 sir?
5    A.  No, I didn't.
6    Q.  Have you received any specialized
7 technical training, and an example of that might be
8 electrician, going to technical school?
9    A.  No.
10    Q.  You say no?
11    A.  No.
12    Q.  Do you have any medical training?
13    A.  No.
14    Q.  Have you ever served in the military?
15    A.  Yes.
16    Q.  Which branch?
17    A.  The United States Marine Corps.
18    Q.  And that was active duty?
19    A.  Active duty.
20    Q.  What was your MLS?
21    A.  1345.  Combat engineer.
22    Q.  Did you ever deploy?
23    A.  No.
24    Q.  How long were you in the Marine Corps?

Page 43

1    A.  Six years.
2    Q.  You were enlisted, correct?
3    A.  Enlisted, yes.
4    Q.  Where were you stationed during the six
5 years?
6    A.  I went to boot camp in Paris Island, South
7 Carolina.  My first duty station was 29 Palm,
8 California.
9        The next duty station was Janico,
10 Virginia and after that back to the marine corps
11 recruit depot as a senior drill director.
12    Q.  What was your rank when you got out?
13    A.  E-5, sergeant.
14    Q.  So E-5 was your pay grade, and your rank
15 was sergeant?
16    A.  Yes.
17    Q.  You kind on touched on this.  Are you
18 familiar with sick call procedures at Graham?
19    A.  Say that again.
20    Q.  Are you familiar with sick call procedures
21 at Graham?
22    A.  Yes.
23    Q.  When did you learn about those sick call
24 procedures, sir?

Page 44

1    A.  I learned about them when I was in
2 Lawrence when I first came to prison.
3    Q.  So you knew about the sick call procedures
4 before you transferred to Graham?
5    A.  Yes.
6    Q.  In general for routine health care
7 requests, do you have to submit a request to be
8 seen?
9    A.  Yes.
10    Q.  Is that a written request or a verbal
11 request?
12    A.  Written request.
13    Q.  After submitting a request, can you give
14 me a general idea as to how long it takes to be
15 seen?
16    A.  Well, it depends.  Like right now I have a
17 request in for my dental.  I broke a tooth.  That
18 was back in December of last year, and I haven't
19 seen anybody for it yet.  So it depends on what they
20 do.
21    Q.  Can you give me a ballpark figure?  Is it
22 usually less than a week or more than a week?
23    A.  Sometimes in that vicinity.  Less or more.
24 Less than a week and sometimes more.

Page 45

1    Q.  Is it usually less than a week or is it
2 usually more than a week?
3    A.  It depends on what the call is for.
4    Q.  Let's say -- I know you brought up an
5 example of a dental request.  What about a routine
6 health care request not related to dental or vision?
7    A.  Maybe a week.
8    Q.  When you get called over to health care,
9 who do you usually see first?  Is it a nurse or a
10 doctor?
11    A.  The nurses.  Usually the nurses talk to us
12 or whatever they have to do before we see a doctor.
13 We don't always see a doctor when we go over there.
14    Q.  Understood.  That is for routine health
15 requests?
16    A.  Yes.
17    Q.  What about an emergency procedure?  Is the
18 procedure different for emergencies?
19    A.  I have had emergencies, and they didn't
20 take it like it was an emergency.  Urinating blood,
21 I mean, I don't know.
22        Maybe a 65 year old man walks around
23 urinating blood all the time, it's no big deal.  I
24 don't understand, but I wasn't seen immediately.

12 (Pages 42 - 45)

Page 46

1    Q.  So they didn't deem that an emergency, is
2  that what you're saying?
3    A.  They didn't.  No, they didn't.
4    Q.  Let's say for a situation like a heart
5  attack, would the situation be different there?
6    A.  I have no idea.  I never had a heart
7  attack.
8    Q.  So you have never been seen on an
9  emergency basis there at Graham Correctional?
10    A.  Not that I can recall.
11    Q.  So according to your records you arrived
12  at Graham on September 21st, 2016.  Does that sound
13  correct to you?
14    A.  That is pretty close, yes.  That sounds
15  correct.
16    Q.  Just a heads up.  I am going to go through
17  a lot of your medical history.  I am going to toss
18  out a lot of dates.  I understand if you don't
19  remember some of this, it is four years ago, the
20  exact dates it happened.
21        I am trying to get an idea as to what
22  you recall happening, okay?
23    A.  Can I ask you a question?
24    Q.  What is the question, sir?

Page 47

1    A.  Why would I have to go back on something
2  that has nothing to do with this?  That doesn't make
3  sense to me.
4    Q.  Well, if you don't understand the
5  relevance of the question, you can object on
6  relevance.  But I'm asking it because it's relevant
7  to something.  Does that answer your question?
8    A.  Yes, it is fine with me.
9    Q.  So the events that occurred relating to
10  this case, they all occurred after October 24, 2016
11  on or after?
12    A.  Yes, in that area.
13    Q.  So October 24, 2016, that's when you first
14  noticed blood in your urine, correct?
15    A.  I believe so.
16    Q.  And to your knowledge that had never
17  happened before, correct?
18    A.  No, it hasn't.
19    Q.  Skipping forward quite a bit, you received
20  a surgery for your right shoulder on November 19,
21  2018, correct?
22    A.  That's correct -- you said 2019?
23    Q.  2018.
24    A.  2018, yes.

Page 48

1    Q.  November 19, 2018?
2    A.  Yes.
3    Q.  Was that surgery successful, sir?
4    A.  No.
5    Q.  And you said you had received a second
6  surgery, is that correct?
7    A.  That's correct.
8    Q.  And that was after the November of 2018
9  surgery?
10    A.  Correct.
11    Q.  Do you know the date of that second
12  surgery?
13    A.  November 6, 2020.
14    Q.  Now, I see you have records there in front
15  of you.  What I'm going to ask you to do ask before
16  you go to the records, try to answer from memory
17  first.
18    A.  I can't do that.  There is so much stuff
19  here.
20    Q.  Hold on, sir.  Try and answer from your
21  memory first.  The first thing we're going to do,
22  and this is why the deposition is so different from
23  everything else in discovery is we're going to try
24  to exhaust your memory.

Page 49

1        If you get to the point where you can't
2  remember, that is fine as long as you're answering
3  honestly.  I am okay with that.  We hold off on the
4  records until we have exhausted your memory, okay.
5    A.  That's why I brought them, so I could be
6  honest and truthful with you.
7    Q.  You could honestly say you don't remember.
8  That is an honest answer.  I am testing your memory.
9  If you don't remember, that's fine.  Okay?
10    A.  All right.
11    Q.  You first noticed this blood in your urine
12  on October 24, 2016, correct?
13    A.  Yes.
14    Q.  Do you recall seeing Dr. Kayira the next
15  day on October 25?
16    A.  No, I don't remember that.
17    Q.  So you don't remember anything about that
18  encounter?
19    A.  That's why I have to go to my records, so
20  if I don't remember something I will try to pick it
21  up.
22    Q.  Answer the question, sir.  Do you remember
23  anything about an encounter with Dr. Kayira on
24  October 24, 2016?

13 (Pages 46 - 49)

Page 50

1     A.   Not to my knowledge.
2     Q.   What about around that same time, not
3  necessarily on October 25, do you remember having
4  any encounters with Dr. Kayira?
5     A.   Probably so.
6     Q.   Do you remember if Dr. Kayira sent you to
7  St. Johns' Hospital on October 26?  This would have
8  been two days after you first noticed blood in your
9  urine.
10     A.   That is why I use my records, not to be
11  funny or trying to be belligerent.  That is why I go
12  to the records.
13     Q.   So my question is do you recall going to
14  St. John's Hospital on October 26, 2016?
15     A.   I remember going to St. John's, yes, but I
16  have no idea what that date was.
17     Q.   You recall going, but not the exact date,
18  is that correct?
19     A.   That's correct.
20     Q.   Do you remember who you saw there at
21  St. John's?
22     A.   No, I don't.  I think I went to the
23  emergency room if I'm not mistaken.
24     Q.   Do you recall receiving a CT scan at

Page 51

1  St. John's?
2     A.   No, I don't.
3     Q.   Do you remember if anyone at St. John's
4  advised you to follow up with the urologist?
5     A.   If I am not mistaken, St. John's told me
6  if the situation continues to see them in two weeks,
7  which I don't think that happened.
8     Q.   Do you remember returning to Graham on
9  October 26 or thereabouts, the same day that you
10  went to St. John's?
11     A.   No, I don't.
12     Q.   Do you remember going out on another writ
13  on November 7, 2016?
14     A.   Probably.
15     Q.   It sounds right?
16     A.   Yes, but I would like to go to my records
17  so I could be correct.
18     Q.   Well, your records are going to say what
19  the records say.  I went through them.  I know the
20  dates.  I don't need you to tell me what the records
21  say.  This is a test of your memory.
22     A.   I am not trying to be belligerent.  I
23  don't need to be tested on my memory.  That's why I
24  wrote this stuff done so I can remember what I said

Page 52

1  or what happened at those different times.
2     Q.   But that's the point of a deposition, sir.
3  You are giving testimony.
4     A.   I understand.
5     Q.   Reading of the records doesn't get us
6  anywhere.  We know what the records say.
7     A.   Why should I give you something incorrect
8  if I have it in front of me correct?
9     Q.   If you don't remember, that is okay.  As
10  long as you're being honest, there is no wrong
11  answer.
12          So the second writ on November 7, 2016,
13  do you recall it happening?
14     A.   No, I don't.
15     Q.   Do you remember seeing Dr. Nayak around
16  that time?
17     A.   I saw Dr. Nayak sometime.  I have no idea
18  exactly when it was.
19     Q.   To your knowledge, sir, is Dr. Nayak a
20  urologist?
21     A.   Yes.
22     Q.   When you first met Dr. Nayak or around
23  that time do you remember him recommending a
24  cystoscopy?

Page 53

1     A.   I have no idea what that means.
2     Q.   A cystoscopy is a medical procedure where
3  they insert a tube into the urethra to sort of
4  examine the bladder.
5     A.   They did that.
6     Q.   Did Dr. Nayak the first time you met him
7  make any other recommendations to your knowledge or
8  memory?
9     A.   No, I have no idea.
10     Q.   Now, about a month after you met
11  Dr. Nayak, this would have been around December 9,
12  2016 according to the records, do you recall seeing
13  him again?
14     A.   I don't recall the date.
15     Q.   Do you remember seeing him four or some
16  weeks after meeting him?
17     A.   I saw him again.  I don't know when.
18     Q.   Do you recall receiving a cystoscopy on
19  that date, the tube to examine the bladder?
20     A.   I have no idea.
21     Q.   If their medical records said that
22  happened, would that surprise you, sir?
23     A.   I have my medical records.  That's why I
24  got all this stuff in front of me.

14 (Pages 50 - 53)

Page 54

1    Q.  I understand you have your records.  Let's
2  say your medical records said you received the
3  procedure December 9, 2016.  I am asking would that
4  sound accurate to you?
5    A.  I have no idea.
6    Q.  When you did receive the procedure, I'm
7  not asking when, but when you did receive the
8  procedure do you recall that the test revealed a
9  mass inside your bladder?
10    A.  I have no idea.
11    Q.  Do you recall Dr. Nayak ever recommending
12  a procedure to remove a mass from your bladder?
13    A.  I have no idea.
14    Q.  Do you recall visiting St. Anthony
15  Memorial hospital around January 11, 2017?
16    A.  I went there in January.  I don't know the
17  exact date.
18    Q.  Okay.  On that date do you recall seeing
19  Dr. Nayak again?
20    A.  Probably.
21    Q.  Do you recall having a procedure around
22  that time?
23    A.  I have no idea.
24    Q.  Do you remember receiving a catheter?  Did

Page 55

1  they place a catheter when you went to St. Anthony?
2    A.  I have no idea.
3    Q.  You don't recall, okay.  When you returned
4  to Graham, and this would have been January of 2017,
5  after your trip out, do you recall if you were
6  admitted to the prison infirmary?
7    A.  Usually that is where I came back to once
8  I leave the hospital.
9    Q.  On this particular encounter, and I know
10  you don't remember the exact date, do you recall
11  being admitted to the infirmary for more than 24
12  hours?
13    A.  Probably.
14    Q.  Do you recall if you were in the infirmary
15  from January 12 to January 18 or thereabouts?
16    A.  I have no idea.
17    Q.  But does the six day period sound wrong to
18  you?
19    A.  I have no idea.
20    Q.  Do you remember if you were in the
21  infirmary for those six days if you received
22  periodic pain medication?
23    A.  I have no idea.
24    Q.  Do you recall if you ever had trouble

Page 56

1  sleeping while in the infirmary?
2    A.  I have trouble sleeping in prison.
3    Q.  Do you have more trouble sleeping in the
4  infirmary than in the housing unit?
5    A.  Probably.
6    Q.  So if the medical records reflected that
7  you had trouble sleeping in the infirmary, would
8  that sound accurate to you?
9    A.  I have no idea.
10    Q.  Do you remember health care workers
11  removing a catheter around January 16, 2017?
12    A.  I don't.
13    Q.  Do you recall if you started peeing blood
14  again on January 25, 2017 or thereabouts?
15    A.  No, I don't.
16    Q.  What about more generally speaking towards
17  the end of January of 2O17, do you remember if you
18  started peeing blood again?
19    A.  No, I don't.
20    Q.  This would have been at the end of
21  January, around January 26 returning to
22  St. Anthony's Hospital?
23    A.  No, I don't.
24    Q.  Do you recall ever receiving another

Page 57

1  catheter?
2    A.  I received them, but I don't know exactly
3  when.
4    Q.  Do you remember coming back to Graham on
5  January 27, 2017?
6    A.  No.
7    Q.  So by February 1st if your medical records
8  reflected that you were no longer peeing blood and
9  they removed the catheter, would that surprise you?
10    A.  Well, it doesn't matter what they say.  I
11  was urinating blood on four different occasions
12  coming back from the hospital.  I remember that.
13    Q.  So you came back from the hospital on
14  January 27.  And if your medical records reflected
15  that you stopped peeing blood by February 1st, does
16  that sound accurate to you?
17    A.  No.
18    Q.  So your testimony here today is that you
19  continued peeing blood after February 1, 2017?
20    A.  I have no idea.  Like I said, I need to go
21  to my records.  They tell me exactly what I need to
22  know.  That's why I wrote them down.  That is four
23  years ago almost.
24    Q.  So you don't remember?

15 (Pages 54 - 57)

Page 58

1    A.   No.
2    Q.   Do you remember returning on February 8th
3 to report that you started peeing blood again?
4    A.   Probably.
5    Q.   Does that sound accurate to you?
6    A.   I have no idea.
7    Q.   Do you remember on February 8th going to
8 St. John's Hospital?
9    A.   I went another time, but I have no idea
10 what date that was
11    Q.   Do you remember if it was early February
12 of 2017?
13    A.   It could have been.
14    Q.   Do you remember when you were at
15 St. John's possibly in early February of 2017
16 receiving another cystoscopy?
17    A.   Probably.
18    Q.   Sorry, sir.  Did you say probably?
19    A.   Yes.
20    Q.   Do you recall staying at St. John's for a
21 few days, approximately three days?
22    A.   No, I don't remember that.
23    Q.   Are you saying it may have happened, but
24 you don't recall or it didn't happen?

Page 59

1    A.   I don't remember.  I will keep telling you
2 the same thing.  I'm being honest.  If I look at my
3 paperwork I could tell you.
4    Q.   I just want honest answers.
5    A.   I kept up with this stuff.  Do you think I
6 didn't keep up with this?  It was written down so I
7 could do this, I could come back and give you the
8 correct dates.
9         Everything that I had when it happened,
10 I wrote it down on a calendar, and I transferred it
11 to the paperwork.  That's all I could tell you.
12    Q.   Great.  So do you recall returning to
13 Graham on February 11, 2017?
14    A.   No.
15    Q.   Do you remember at the end of February,
16 February 24, seeing another urologist?
17    A.   What do you mean when you said another
18 urologist?  The only person I saw was Dr. Nayak.
19    Q.   Another urologist?
20    A.   Other than Dr. Nayak, no.
21    Q.   Do you recall seeing Dr. Nayak on
22 February 24, 2017?
23    A.   Dr. Nayak is the one that did all the
24 surgeries until I was sent to St. John's, and I

Page 60

1 don't know who was there.
2         All I know is he called his people at
3 St. John's and told them that he was doing something
4 else, and they took me up there.
5         And it wasn't him, it was someone else.
6 But the other times it's been Dr. Nayak.
7    Q.   So if you saw a urologist on February 24,
8 it would have been Dr. Nayak?
9    A.   It could have been.
10    Q.   Between February 11 and February 24, do
11 you recall ever peeing blood?
12    A.   I have no idea.
13    Q.   On March 24, still on 2017, do you recall
14 returning to the Graham HCU?
15    A.   No, I don't.
16    Q.   What about more generally speaking, do you
17 recall returning to the Graham HCU around the end of
18 March of 2017?
19    A.   I don't remember the dates.
20    Q.   Do you recall ever returning to the Graham
21 HCU because you had difficulty urinating, and you
22 were experiencing pain while you were trying to go?
23    A.   Let's put it this way.  Everything that's
24 happened with this, that's what's happened.  I was

Page 61

1 urinating blood all this time from October of 2016
2 until April of 2017.  I know that much.
3    Q.   But that doesn't answer my question, sir.
4 Do you recall, maybe not the specific day, reporting
5 to the HCU with difficulty urinating and pain while
6 you were trying?
7    A.   Probably.
8    Q.   So you don't recall specifically, but it
9 could have happened?
10    A.   Yes.
11    Q.   Do you recall on April 9 going back for
12 the same complaint?
13    A.   It's possible.
14    Q.   Do you recall on April 11 a nurse
15 attempting to give you lidocaine gel?
16    A.   I know Terry Martin tried to apply it.
17    Q.   Not apply it --
18    A.   Yes.  But like I explained to them at that
19 time I couldn't even pee.  Nothing could go up in my
20 penis.
21         And when they tried to do it that way at
22 health care, they saw it came right back out, and I
23 explained that to them.  They couldn't even get a
24 catheter inside me during that time.  That is how

16 (Pages 58 - 61)

Page 62

1 bad my situation was.
2    Q.   Right.  So on April 11 you did not take
3 the Lidocaine gel, is that correct?
4    A.   It wouldn't go in.  So why would I take
5 it?
6    Q.   So you didn't take it?
7    A.   It wouldn't go in, so why would I take it?
8    Q.   Don't answer the question with a question.
9 Did you take the lidocaine gel?
10    A.   Yes, and it didn't work.
11    Q.   You say you took the lidocaine gel?
12    A.   They gave it to me in the infirmary one
13 time that I remember, and it didn't work.
14    Q.   When you say they gave it to you, are you
15 referring to the times they applied it?
16    A.   Yes.
17    Q.   If they were to offer you a tube, do you
18 recall that ever happening?
19    A.   Yes.
20    Q.   With instructions on how to apply it?
21    A.   Yes.
22    Q.   At that time did you take the lidocaine
23 gel?
24    A.   Yes, and it didn't work.

Page 63

1    Q.   Why do you say it didn't work, sir?
2    A.   If nothing can come out of me, how is
3 anything going to go inside of me.  If you notice in
4 the doctor's report he talked about I have a
5 restricted urethra or whatever that means, meaning
6 it's closed up.  So how could anything go in?
7    Q.   Are you saying it couldn't go in?  Again,
8 you're answering with questions.
9    A.   I am explaining to you what I know.
10    Q.   What do you know, sir?
11    A.   I just told you.
12    Q.   Were you able to use it?
13    A.   No, I was not.  It wouldn't go in.
14    Q.   So lidocaine gel, did any nurse try and
15 explain how it was to be applied?
16    A.   Probably.
17    Q.   But you don't remember specifically?
18    A.   No.
19    Q.   I'm sorry, I couldn't hear your answer,
20 sir.
21    A.   No.
22    Q.   In your own words could you tell me when
23 you did try and apply, what was the method of the
24 application?

Page 64

1    A.   I don't remember.
2    Q.   You don't remember?
3    A.   No.
4    Q.   Do you recall ever telling anyone that you
5 didn't want to apply it because you weren't a
6 medical doctor?
7    A.   I don't remember.
8    Q.   On April 16, do you recall being admitted
9 to the prison infirmary?
10    A.   Let's put it this way, the day that I was
11 assaulted by Terry Martin was the day that I ended
12 up going to the infirmary, and the next day I had to
13 go have another procedure done for urinating blood.
14    Q.   I'm not asking about that day, sir.  I'm
15 asking about April 16.
16    A.   I don't have that in front of me.  I don't
17 know.  I don't remember.
18    Q.   You don't remember?
19    A.   No.
20    Q.   On April 17, do you recall getting another
21 cystoscopy from Dr. Nayak?
22    A.   Again, I just explained it to you.
23    Q.   Sir, on April 17, do you recall receiving
24 another cystoscopy from Dr. Nayak?

Page 65

1    A.   Whatever day that was that I was
2 assaulted, I went back to see him.
3    Q.   I'm not asking about -- that was April 19
4 according to your complaint.  I am asking about
5 April 17, two days prior.
6    A.   I don't have anything in front of me to
7 remember that with.
8    Q.   So you don't have an independent
9 recollection of that event?
10    A.   No.
11    Q.   So on April 25, 2017, do you recall
12 receiving a surgery from Dr. Nayak?
13    A.   I don't remember the date.
14    Q.   You don't remember the date?
15    A.   I will say it again.  If I could use my
16 records I could go to it and tell you exactly what
17 happened.
18    Q.   You could tell me that as many times as
19 you like.  I'm testing your memory.  I want to see
20 what you remember about these events.
21    A.   If you are trying to get me to say I don't
22 remember anything, is that where we're going with
23 this?
24         This happened four years ago.  That is

17 (Pages 62 - 65)

Page 66

1  why I brought paperwork to be able to explain anyone
2  asking me these questions here it is right here.
3  There it is right there in front of me.  I don't
4  know what else to tell you.
5      Q.   Do you recall receiving a surgery from
6  Dr. Nayak on April 25?
7      A.   It could have been.
8      Q.   To your knowledge, was that surgery around
9  that time successful?
10     A.   Let's put it this way, the last surgery I
11 had with him it was successful because he kept me in
12 the hospital and did what health care wouldn't do.
13     Q.   So let's say your medical records
14 reflected that you received a surgery on April 25,
15 2017 and that was the last surgery you had related
16 to your urinary condition.
17          Are you telling me now that surgery was
18 successful?
19     A.   It was.  I haven't urinated blood since.
20     Q.   So after April 25, you have also been able
21 to urinate without difficulty or pain, correct?
22     A.   Yes.
23     Q.   Is it your testimony that between
24 October 24, 2016 and the date of the surgery, which

Page 67

1  according to your records is April 25, 2O17 you were
2  periodically peeing blood or the whole time you were
3  peeing blood?
4      A.   The only thing I could tell you is during
5  the times I had the surgeries it would stop and then
6  it started again.
7          Whatever those days were, two or three
8  days, five days, whatever it would start over again
9  because health care did not do what Dr. Nayak told
10 them to do.
11         I didn't get the medication he told them
12 to give me or anything else.  So I continued to have
13 episodes of urinating blood until he dealt with the
14 it the last time and that was it.
15     Q.   So I want to come back to that point
16 because it's worth exploring.  Just so I am
17 understanding what happened, it seems like the
18 condition would arise, the blood in your urine.
19         You would go to health care, and they
20 would send you out.  Whatever they did while you
21 were out it would resolve for a few days.  You would
22 come back, and it would come back again.  Is that
23 fair?
24     A.   That's correct.

Page 68

1      Q.   So you indicated that Dr. Nayak
2  recommended you receive some medications.  What
3  medications are those, sir?
4      A.   They're in my records.
5      Q.   So you don't recall specifically what
6  medication recommended?
7      A.   No, I don't.
8      Q.   What if anything besides medication, did
9  he recommend any treatments or other procedures?
10     A.   Not that I remember.
11     Q.   So anything that he recommended would be
12 in the records, correct?
13     A.   Correct.
14     Q.   I would like to transition a little bit to
15 your shoulder injury, sir.  A quick check.  Are you
16 okay, could you go on, sir, or do you need a break?
17     A.   I am good.
18     Q.   Do you recall seeing Dr. Kayira around
19 May 5, 2017 for right shoulder and back pain?
20     A.   Say that date again.
21     Q.   May 5, 2017.  To put it in context, this
22 would have been about not quite two weeks after your
23 last surgery for your urinary condition.
24     A.   What was your question?

Page 69

1      Q.   Did you see Dr. Kayira around that time
2  for your right shoulder and back pain?
3      A.   Probably so.
4      Q.   Does that sound accurate?
5      A.   Not accurate.  It sounds like it could be.
6  I don't know what the accuracy is to it or not.  I
7  don't know what the date is.
8      Q.   Sir, if it was in your medical records
9  would that surprise you?
10     A.   No.  Nothing surprises me.
11     Q.   Would it surprise us to learn that Dr. Kayira
12 prescribed pain medication on that day?
13     A.   I remember being prescribed pain medicine
14 that didn't work.
15     Q.   Do you remember receiving a right shoulder
16 and back x-ray on May 8, 2017?
17     A.   I don't know the dates, but I did receive
18 x-rays.
19     Q.   Does the time frame sound accurate?
20     A.   It could be.
21     Q.   Do you remember what those x-rays showed,
22 sir?
23     A.   The only conversation I had with
24 Dr. Kayira after the first surgery is that he said I

18 (Pages 66 - 69)

Page 70

1 have arthritis.
2    Q.  Did he specify where you had arthritis,
3 sir?
4    A.  Somewhere in the shoulder.
5    Q.  So do you recall this would have been a
6 month after that on June 1st seeing Dr. Kayira?
7    A.  It's possible.
8    Q.  Do you recall around that time him
9 prescribing you Naproxen and Robaxin?
10    A.  He had me take those two medications.
11    Q.  Those two medications sound familiar to
12 you?
13    A.  Yes.
14    Q.  Do you remember if he also referred you
15 for physical therapy?
16    A.  Yes.
17    Q.  Around July 12, 2017, do you recall a
18 physical therapy evaluation at the Hillsboro area
19 hospital?
20    A.  I went there.  I don't remember the date.
21    Q.  So do you recall a physical therapist who
22 evaluated you?
23    A.  I think his name was Andy.
24    Q.  Would Andrew Camp sound right to you?

Page 71

1    A.  I don't know.  All I knew was Andy.
2    Q.  Fair enough.  Do you remember if Andy or
3 your physical therapist, whatever his name may have
4 been, did he assign you a set of exercises to help
5 you with your shoulder pain?
6    A.  Yes, he did.
7    Q.  Did he give you a handout detailing those
8 exercises?
9    A.  Yes.
10    Q.  And the handout, I think it's in your
11 medical records.  It included pictures illustrating
12 the exercises, correct?
13    A.  Correct.
14    Q.  Do you remember where you performed those
15 exercises?
16    A.  At health care.
17    Q.  Do you remember how often would you go?
18    A.  Every day.
19    Q.  Is that seven days a week or five days a
20 week?
21    A.  Seven.
22    Q.  So how long did the exercises take you
23 each day to complete?
24    A.  Probably about 45 minutes to an hour.

Page 72

1    Q.  And do you remember roughly about how long
2 you would go to the health care to do those
3 exercises?  Are we talking one month, two months?
4 How often or for how long?
5    A.  It went for a while.  I don't know.  It's
6 been a couple of years.
7    Q.  Do you think it was more than one month or
8 less than one month?
9    A.  The duration of the therapy?
10    Q.  Yes, sir.
11    A.  More.
12    Q.  Was it more than six months or less than
13 six months?
14    A.  Like I said, it was anywhere between one
15 and two years.  It went that long.  Let's put it
16 this way.  It went up until the time I had the first
17 surgery.
18    Q.  The first surgery in September of 2018?
19    A.  The first surgery in November of 2018.
20    Q.  Did you ever experience any improvement in
21 your pain after you began regularly performing the
22 physical therapy exercises?
23    A.  No.
24    Q.  You never experienced any improvement?

Page 73

1    A.  No.
2    Q.  Did you ever report experiencing any
3 improvement?
4    A.  I don't know.  I don't even remember who
5 to report it to.  We had nurses back there to watch
6 us.  Other than that, I have no idea.
7    Q.  So on August 17, do you recall asking
8 Dr. Kayira for additional physical therapy, but this
9 time for your lower back?
10    A.  I don't remember.  Let me say this.  In
11 conclusion towards the back issue I still haven't
12 had anything done with my back.
13    Q.  So you don't recall making that request?
14    A.  I probably made the request, but there is
15 nothing that was done about it, let's put it that
16 way.
17    Q.  So you don't recall on September 12
18 returning to Hillsboro Hospital for an evaluation of
19 your back?
20    A.  It could have been.  I don't remember.
21    Q.  You don't remember specifically?
22    A.  No, I don't.
23    Q.  So you don't remember seeing Andrew Camp
24 that day?

19 (Pages 70 - 73)

Page 74

1    A.  I don't remember.
2    Q.  Do you remember receiving another set of
3  exercises this time for your lower back?
4    A.  It's possible.
5    Q.  Does that sound familiar?
6    A.  It sounds familiar.  I just don't
7  remember, but it sounds familiar.
8    Q.  If it was in your medical records, would
9  that surprise you?
10    A.  No, it wouldn't because like I said it
11  sounds familiar.
12    Q.  Do you recall around February of 2018,
13  this is a little more recent, February 5, 2018.  I
14  know it's still two years ago.
15    A.  Say that again.
16    Q.  February 5, 2018, do you recall if you
17  received additional right shoulder x-rays?
18    A.  Yes.  I know I had a couple of x-rays for
19  the shoulder.  I don't remember what time, though.
20    Q.  So you wouldn't know what those x-rays
21  revealed, would you?
22    A.  Other than what he told me.
23    Q.  Do you recall what he told you?
24    A.  That I had arthritis.

Page 75

1    Q.  As far as you know, up to this point
2  Dr. Kayira thought you had arthritis in your
3  shoulder?
4    A.  What he told me.
5    Q.  Do you recall seeing Dr. Kayira on
6  April 2, 2018?
7    A.  No, I don't remember.
8    Q.  Do you recall receiving a referral to an
9  orthopedic specialist at that time?
10    A.  No.  What I do remember is on a Saturday.
11  I don't remember the date.  There is an IDOC doctor
12  who doesn't work here came in and saw me on a
13  Saturday.
14        And he said that I had rotator cuff
15  problems and probably more.  He put in a collegial
16  for me to go see an outside specialist and that was
17  it.
18    Q.  That was from someone other than
19  Dr. Kayira, is that correct?
20    A.  Yes.
21    Q.  We're still in April of 2018.  Do you
22  remember receiving additional right shoulder x-rays?
23    A.  Like I said, I received a few of them.  I
24  don't know how many.

Page 76

1    Q.  Do you remember seeing an orthopedic
2  doctor on May 21st, 2018?
3    A.  What is his name?
4    Q.  Dr. El-Bitar.
5    A.  Yes, I remember seeing him.
6    Q.  If your records show on May 21st, 2018
7  that you saw Dr. El-Bitar, does that sound accurate?
8    A.  Yes.
9    Q.  Do you know if Dr. El-Bitar gave you some
10  exercises to help with your shoulder pain?
11    A.  He gave me a cortisone shot, and he
12  explained to me that I needed shoulder replacement
13  surgery.  And that I would see him again in a couple
14  of weeks.  I'm not looking at my papers, so I don't
15  know.
16    Q.  I understand.  You're saying he
17  recommended surgery before he took an MRI of your
18  shoulder?
19    A.  He did all of that.
20    Q.  I know he did.  We're looking at the time
21  line of events.
22    A.  The first time I saw him from his
23  examination, he said it seemed like rotator cuff was
24  and other things were a problem, but I needed

Page 77

1  probably after the MRI, which I don't remember when
2  that was, I needed shoulder replacement surgery.
3    Q.  So getting to that since you bring it up,
4  on June 15, 2018 do you recall receiving a right
5  shoulder MRI?
6    A.  Yes, I did receive one. I don't remember
7  what the date was.
8    Q.  Did you know that Dr. El-Bitar reviewed
9  that MRI on June 20?  Were you aware of that?
10    A.  I have no idea when he reviewed it.
11    Q.  Did he ever tell you what he recommended
12  based on that MRI?
13    A.  That's probably when he recommended the
14  shoulder replacement surgery.
15    Q.  I will read you something from the
16  recommendations.  You tell me if it sounds familiar.
17        Open quote, "The main problem is this
18  patient's shoulder his arthritis of the glenohumeral
19  joint area.  The patient should continue
20  conservative treatment as long as he can."
21        Does that sound familiar, sir?
22    A.  It could be in the records.  I don't know.
23  I'm not reading it.
24    Q.  I understand.  Does that sound familiar?

20 (Pages 74 - 77)

Page 78

1 Did he ever say that to you?
2   A.  I don't remember.  All I remember is
3 what's in the records.
4   Q.  On August 15, 2018, do you remember seeing
5 Dr. El-Bitar again?
6   A.  I saw him again.  I don't remember the
7 date.
8   Q.  So do you have any awareness of when your
9 shoulder surgery was actually approved, sir?
10  A.  No, I don't.
11  Q.  Would it surprise you to learn it was
12 approved August 24, 2018?
13  A.  Why would that surprise me if I needed it?
14  Q.  So it didn't surprise you?
15  A.  Why would it?  I needed surgery.
16  Q.  So did it surprise you or did it not
17 surprise you?
18  A.  No.
19  Q.  Okay.   Do you recall visiting St. Francis
20 Orthopedics Center on September 5, 2018?
21  A.  I was there for the surgery.  I don't
22 remember what date it was.
23  Q.  I understand.  Do you remember meeting
24 Dr. Painter when you went there?

Page 79

1   A.  Yes.
2   Q.  Do you recall seeing Dr. Painter again a
3 month later on October 5, 2018?
4   A.  I don't know how long it was, but I saw
5 him again.
6   Q.  Do you remember anything about
7 Dr. Painter's recommendations?
8   A.  He gave me a shot, I believe.  And he said
9 he was going to do surgery if he and I agreed to it.
10 And I thought it was going to be the replacement,
11 but it wasn't.
12  Q.  Do you remember seeing him November 6,
13 2018, this is more recently?
14  A.  No, I don't.
15  Q.  But you do recall receiving the right
16 shoulder surgery on November 19, 2018, correct?
17  A.  Yes.
18  Q.  That was performed by Dr. Painter,
19 correct?
20  A.  Correct.
21  Q.  I understand from your complaint you
22 believe you did not receive pain medication that
23 Dr. Painter recommended after the surgery, is that
24 correct?

Page 80

1   A.  That's correct.
2   Q.  Do you remember what medication he
3 recommended?
4   A.  Not really.  It might have been Oxycodone
5 or something like that.  But they didn't give it to
6 me when I got back here.
7   Q.  Do you remember what you received instead?
8   A.  Tylenol.
9   Q.  What kind of Tylenol, sir?
10  A.  I have no idea.  I don't remember.  It was
11 Tylenol.
12  Q.  Why do you think you didn't get the
13 medication that Dr. Painter recommended?
14  A.  I have no idea.  That's what they do.
15  Q.  So you saw Dr. Painter for a follow-up
16 appointment December 3, 2018, is that correct?
17  A.  Probably.
18  Q.  Do you remember what medication
19 Dr. Painter recommended at that visit?
20  A.  No, I don't.
21  Q.  So around January 8, 2018, do you remember
22 being evaluated for right shoulder physical therapy
23 again at Hillsboro Area Hospital?
24  A.  I don't recall the date, but I know I

Page 81

1 probably was going to have physical therapy again.
2   Q.  Does that sound familiar after your
3 shoulder surgery going for a physical therapy
4 evaluation around that time?
5   A.  Yes, that sounds familiar going to
6 physical therapy.  Yes.  I don't know what date.
7   Q.  If your medical records show it was
8 January 8th, would that surprise you?
9   A.  No.  I am not looking at it.  I got it,
10 but I can't look at it.  You told me don't look at
11 it.
12  Q.  Do you remember the name of your physical
13 therapist during that visit?
14  A.  It may have been Andy again, if I am not
15 mistaken.  I don't remember.  It's been two or three
16 of them since I've been dealing with this.  So I
17 don't remember.
18  Q.  I understand, but does the name Casey
19 Cruthus sound familiar?
20  A.  She was a woman.
21  Q.  Yes, sir.
22  A.  It might have been her because the last
23 two people I seen for therapy has been two women,
24 not Andy.

21 (Pages 78 - 81)

Page 82

1    Q.  With the exception of Dr. Painter's
2  recommended pain medicine following the November
3  surgery, are you aware of any specialists'
4  recommendations that were not approved between
5  October 2016 and November of 2018?
6    A.  I don't have any idea what they do.
7    Q.  So you're not aware of specifically any
8  specialists' recommendations that were not approved?
9    A.  No.
10    Q.  Now, I know you already talked a little
11  about it, but I would like to ask you some questions
12  about your grievances.  Again, we're just going off
13  memory.  So I understand if you don't recall.  This
14  was a few years ago.
15          But generally speaking, do you recall in
16  November of 2016 writing a few grievances about the
17  fact that you were urinating blood at the time?
18    A.  I probably did.  I don't remember, though,
19  how many it was.
20    Q.  Well, if there were five grievances from
21  November of 2016 related to your hematuria or peeing
22  blood, would that surprise you, sir?
23    A.  I have no idea.
24    Q.  But you do recall writing grievances

Page 83

1  around that time, right?
2    A.  Yes.
3    Q.  Did you appeal any of those grievances to
4  the ARB, sir?
5    A.  I have no idea who they were.
6    Q.  Do you remember naming Dr. Kayira in your
7  November 4th grievance?
8    A.  I have no idea.
9    Q.  Do you recall receiving a response from
10  the ARB to any of those grievances?
11    A.  No, I don't.
12    Q.  Do you recall filing a grievance on
13  April 11, 2017?  This would have been about a week
14  before the incident.
15    A.  Well, she showed me some stuff.
16  Ms. DeHart showed me on the screen.  I remember what
17  she showed me on the screen.
18    Q.  And this was the April 11, 2017 grievance,
19  right?
20    A.  Yes.
21    Q.  That related to difficulty urinating and
22  attendant pain?
23    A.  Yes.  I don't remember exactly what it
24  says, but I'm pretty sure that is what it was.

Page 84

1    Q.  Do you recall, sir, if you appealed that
2  to the ARB?
3    A.  No, I don't remember.
4    Q.  So besides the November 2016 and April 11,
5  2O17, do you recall, sir, writing any additional
6  grievances related to either the blood in your urine
7  or pain with difficulty urinating?
8    A.  I don't remember.
9    Q.  I will tell you right now based on our
10  records, that is all I could find.  That was six
11  grievances.  So that is plenty.
12          I'm not going to say you didn't exhaust.
13  I am looking for any other grievances that might be
14  out there that we were not aware of.  Are you aware
15  of any others besides those six?
16    A.  No.  If I could go through my records
17  because I keep a copy of everything.
18    Q.  And we have the records, and I couldn't
19  find one.  That is why we're testing your memory
20  because maybe you remember something that is not in
21  the records.  I don't know.
22          Moving on to the shoulder issue.  On
23  April 28, 2017, do you recall writing a grievance
24  relating to the April 19th incident?

Page 85

1    A.  I don't know.  Like I said, I have to look
2  at stuff in front of me right now.
3    Q.  What about on August 14, 2018, that was a
4  little more recently.  Do you remember writing
5  another grievance about your shoulder pain?
6    A.  No.  It could be, but I don't know.
7    Q.  So let's say those two grievances were in
8  your records.
9          Are you aware of any other grievances
10  besides two related to your shoulder injury that you
11  wrote?
12    A.  Outside of the one that's in the complaint
13  package, no.
14    Q.  I believe the one in your complaint was
15  the April 28th, sir.
16    A.  If I'm not mistaken, probably.
17    Q.  I also found the August 14, 2018.  I'm
18  checking to see if there is any more out there.
19    A.  I understand.
20    Q.  Besides those two grievances, you don't
21  recall writing any additional grievances related to
22  the shoulder pain?
23    A.  Again, I got a folder full of grievances.
24  I don't remember every one of them.

22 (Pages 82 - 85)

Page 86

1    Q.   I understand.  Just to wrap up quick.
2  Mr. Long, prior to April 19, 2017, that was the date
3  of the incident for reference, did you have a
4  history of shoulder pain?
5    A.   No.
6    Q.   So you never reported shoulder pain?
7    A.   No.
8    Q.   Did you have arthritis before that, sir?
9    A.   I didn't even know I had arthritis.
10    Q.   But are you aware you have arthritis now?
11    A.   I got it in certain other places, but I
12  didn't know it was in my shoulder.
13    Q.   Where do you have arthritis, sir?
14    A.   Probably in my hands, my knees.  I'm 70
15  years old.
16    Q.   Besides your hands and knees, where else
17  do you have arthritis?
18    A.   That's all I could think of.  That is what
19  hurts more than anything.
20    Q.   Are you aware if you have arthritis in
21  your right shoulder, sir?
22    A.   I wasn't aware of it.
23    Q.   You testified earlier that Dr. Kayira told
24  you you had arthritis in your right shoulder?

Page 87

1    A.   That's what he said.  I explained that to
2  you.  I'm talking about what you're talking about
3  right now.
4    Q.   You don't believe Dr. Kayira was right.  Do
5  you think he was wrong?
6    A.   Well, there were too many things going
7  wrong for it to just be arthritis.
8    Q.   Okay.  So you filed your initial
9  complaint, sir, and this would have been the first
10  one on August 13, 2019, is that correct?
11    A.   Say that again.
12    Q.   August 13, 2019?
13    A.   What about it?
14    Q.   Is that the date of your original
15  complaint in this case when you first filed?
16    A.   No.  I filed August 1, 2019.
17    Q.   Do you recall amending your complaint on
18  December 1, 2020?
19    A.   It was amended.  I don't remember the
20  date.
21    Q.   If the court document reflected
22  December 1st, would that surprise you?
23    A.   No.  The Court was the one that said I
24  could amend it.

Page 88

1    Q.   And when you amended your complaint you
2  added Dr. Kayira as a defendant, correct?
3    A.   He should have been there in the first
4  one.
5    Q.   But he wasn't, was he?
6    A.   Yes.  As far as I know, his name is in
7  there.
8    Q.   His name is in there, but he didn't
9  survive merit review, correct?
10    A.   That is why I like to go to my records.  I
11  don't like to be tripped up like this, okay.
12    Q.   Do you remember after you filed your
13  first complaint before you filed the second
14  complaint, that span was a little over a year, was
15  Dr. Kayira a defendant during that time span?
16    A.   Should have been if he wasn't.
17    Q.   Do you remember the Court's merit review
18  during that time?
19    A.   I have it in front of me.
20    Q.   I'm asking you if you remember the
21  contents of it?
22    A.   No, I don't.
23    Q.   Sir, why did you name Dr. Kayira a
24  defendant in this case?

Page 89

1    A.   Because he is.
2    Q.   Why?
3    A.   Deliberate indifference.
4    Q.   What does that mean?
5    A.   That means he knew something, but didn't
6  do anything about it.
7    Q.   What did he know?
8    A.   He knew I had shoulder problems.  He knew
9  what happened to me.  He knew that Terry Martin
10  slammed me in the wheelchair.  They all do.
11    Q.   Was he there that day?
12    A.   Yes, he was there.
13    Q.   Was he in the room there?
14    A.   No, I was outside when I got slammed in
15  the wheelchair.  He was inside the office.  He knew
16  what they talked to him.
17    Q.   So you think he knew you got slammed in
18  the chair because someone told him?
19    A.   I'm not talking about that.  He was
20  indifferent about my shoulder, but he was there the
21  day it happened.
22    Q.   But he's not claimed in the excessive
23  force claim?
24    A.   No.

23 (Pages 86 - 89)

Page 90

1    Q.   About the deliberate indifference to your
2  shoulder, what did he know is what I'm asking?
3    A.   It's in the paperwork.
4    Q.   Based on your opinion, sir, what did
5  Dr. Kayira know?
6    A.   I said it's in the paperwork.
7    Q.   You can't cite the paperwork.  That is not
8  testimony.
9    A.   If I am not looking at it, I have to say
10  it.  I wrote something in there.  So I need to look
11  at it to tell you what I wrote.
12    Q.   But you don't right now know from your
13  recollection?
14    A.   No.  I'm not going to get into that with
15  you right now because I am not going to be held
16  accountable for oh, he didn't say it this time.  But
17  you didn't say that the other time.  I can't read my
18  records, how can I answer the question?
19    Q.   From your memory.  Do you remember?
20    A.   I still need to look at my paperwork.
21    Q.   You don't remember?
22    A.   I'm not saying I didn't remember.  I need
23  to look at something to show what I remember, okay.
24  That's why it was written down.  I am a Marine.

Page 91

1       Let's get this straight.  I follow
2  orders, and I write stuff down so I can remember so
3  it don't be a situation where I am sitting here
4  trying to gasp for air, and I can't get any because
5  I am not able to reach here and put some air in me.
6  That is why this stuff is here.
7    Q.   So getting back to my actual question, do
8  you think that Dr. Kayira was trying to hurt you?
9    A.   I have no idea what you mean.
10    Q.   You don't know what I mean?
11    A.   No.  Hurt me how?  He didn't put his hands
12  on me.  What are you talking about?
13    Q.   Do you think that Dr. Kayira intended to
14  cause you pain?
15    A.   I don't know what his mind set was.
16    Q.   Fair enough.  Do you think he was trying
17  to make you better?
18    A.   I have no idea.
19    Q.   So you have no idea why he did what he
20  did?
21    A.   Did what?  What did he do?
22    Q.   Treated you.
23    A.   After how long?
24    Q.   Are you asking me questions?

Page 92

1    A.   Because I am only going along with what
2  you're saying.  I am trying to paint the picture for
3  you.  No, he didn't do what he was supposed to.
4    Q.   What is that?  He didn't do what was he
5  supposed to do, is that what you said?
6    A.   Look, I got reports on shoulder surgeries,
7  rotator cuff.  All of that is explained in there,
8  what happens if they don't do certain things at
9  certain times.
10    Q.   You didn't answer the question.  What was
11  Dr. Kayira supposed to do that he didn't do?  I
12  can't hear you.
13    A.   I'm not talking.  I am not answering the
14  question.  I can't reach over and tell it to you
15  what I said.
16    Q.   So you're refusing to answer?
17    A.   I am not refusing to answer anything.  I
18  have paperwork here that I could tell you everything
19  you need to know.  What happened, when it happened,
20  how it happened and dates and everything.
21       And you're still trying to get me to do
22  something from memory, which I don't remember every
23  detail of the situation.  I am trying to explain to
24  you.

Page 93

1    Q.   What was Dr. Kayira supposed to do that
2  he didn't do?  Could you give me one example?
3    A.   He is a doctor.  He's supposed to help me.
4  Everyone that comes over there with something that
5  is medically wrong with them, that is what he's
6  supposed to do.
7    Q.   Do you think he didn't help you?
8    A.   No, he didn't.
9    Q.   At all?
10    A.   No.  It took another doctor from outside
11  IDOC to come in and explain to me what was wrong
12  with my shoulder, and he led a collegial to send me
13  to a specialist.  Dr. Kayira never examined my
14  shoulder physically, never.
15    Q.   What do you mean by physically examine?
16    A.   You know how doctors try to test your
17  shoulder to see what's going on in there.
18    Q.   Is that what you mean, he didn't
19  manipulate your shoulder?
20    A.   He never did any of that.
21    Q.   That is what I was after, something like
22  that.
23    A.   Well, you got it.
24    Q.   That is one thing.  What else didn't he

24 (Pages 90 - 93)

Page 94

1 do?
2    A.  I'm leaving it there.
3    Q.  So he didn't physically examine your
4 shoulder, is that what you're saying?
5    A.  No, he didn't.  So how could he tell me
6 what's wrong with it?
7    Q.  Besides the x-rays?
8    A.  X-rays don't tell everything.  That's why
9 I had to have the MRI.
10    Q.  So besides physically examining your
11 shoulder, you're not aware of anything else
12 Dr. Kayira should have done, but didn't do?
13    A.  No.  This is prison, man.  This is prison
14 doctors.  If I was out there in the world I would
15 have a good doctor or a doctor that knows what he
16 he's doing, and I wouldn't be in this situation.
17    Q.  What is the standard of care for treating
18 hematuria or peeing blood?
19    A.  What is the standard procedure for
20 treating?
21    Q.  What is the standard of care for treating
22 hematuria or peeing blood?
23    A.  I have no idea.  They're supposed to be
24 the doctor.  If they're not qualified, they're

Page 95

1 supposed to send me to a specialist, someone who
2 knows what's going on.
3    Q.  What is the standard of care for treating
4 shoulder pain?
5    A.  The same thing.  If they don't know what
6 they're doing, they have to send me to a specialist
7 who knows what they are doing, an orthopedic surgeon
8 or someone like that.
9    Q.  You're under the impression you should
10 have been referred to an orthopedic specialist right
11 away?
12    A.  Dr. Kayira is not.  He's not an orthopedic
13 surgeon.  How would he know?
14    Q.  How would he know, he's not a doctor?
15    A.  He's not an orthopedic surgeon.
16    Q.  Is your testimony today you should have
17 been referred to an orthopedic surgeon or specialist
18 as soon as you reported shoulder pain?
19    A.  I don't know how soon it should have been,
20 but it took longer than what it should have been.
21    Q.  In your amended complaint, sir, and this
22 is the one filed December 1, 2020, a little ways ago
23 you didn't request any monetary damages in there,
24 sir.  Do you remember that?

Page 96

1    A.  What grievance are you talking about?
2    Q.  It is not a grievance.  In your amended
3 complaint December 1, 2020.
4        Do you remember seeking any monetary
5 damages in that complaint?
6    A.  I don't remember.  I probably didn't.
7    Q.  In your testimony you said you were going
8 to go after $700,000, is that correct?
9    A.  That's correct.
10    Q.  And you said that was split between
11 compensatory and punitive damages, is that correct?
12    A.  Whatever the Court deems necessary from
13 the pain and suffering that I've suffered.  The
14 sleepless nights I had too much.  This shoulder in
15 the situation it was, and I should have only been
16 given one surgery, replacement.  And I would never
17 be going through none of this.
18        I ended up having to suffer two
19 surgeries.  Today I don't even have a rotator cuff
20 anymore in my shoulder.
21    Q.  So you are alleging that the November 19th
22 surgery from Dr. Painter was infective?
23    A.  You need to speak to Dr. El-Bitar about
24 that.  He was upset that they didn't replace it.

Page 97

1    Q.  Were you upset that they didn't replace
2 it?
3    A.  Yes, I am.
4    Q.  So you believe that surgery was
5 ineffective?
6    A.  Yes, I do.
7    Q.  And Dr. Painter performed that surgery, is
8 that correct?
9    A.  That's correct.
10    Q.  So besides pain and suffering, you
11 mentioned sleepless nights.  How else did you
12 calculate the $700,000?
13    A.  I didn't calculate anything.
14    Q.  You just guessed?
15    A.  I didn't guess at anything.  I know what
16 I'm going through.
17    Q.  How did you calculate the $700,000?
18    A.  Well, it ain't a million.  All I'm saying
19 to you is pain and suffering and all the stuff that
20 I've gone through was stuff I shouldn't have had to
21 go through.  That's why I said it.
22    Q.  So pain and suffering to you, obviously,
23 this is a subjective assessment, is worth $700,000.
24 Is that what you're saying?

25 (Pages 94 - 97)

Page 98

1    A.  You could show it like I did and figure
2 like I am now.  What do you think?
3    Q.  I'm not giving testimony.
4    A.  I'm saying what do you think.  If I am
5 sitting with a shoulder that was perfectly okay
6 before this happened and I got one shoulder smaller
7 than the other one, and this one doesn't even have a
8 rotator cuff anymore.  You tell me.  And I was
9 assaulted.
10    Q.  So pain and suffering.  Besides pain and
11 suffering, did anything else go into that $700,000?
12    A.  I have no idea.
13    Q.  You don't know how you arrived at that
14 figure?
15    A.  I arrived at it because that is what I
16 feel is necessary to be done for me.
17    Q.  I didn't hear the last bit.
18    A.  I said that is what is necessary in the
19 situation that happened to me.
20    Q.  Necessary to do what, sir?
21    A.  Well, you handle cases like this, correct?
22    Q.  Sir, again, I am not giving testimony.
23    A.  Well, you should know the answer.
24    Q.  Necessary to do what, sir?  I am asking

Page 99

1 your opinion.
2    A.  What do you mean?
3    Q.  You said the $700,000 was necessary.  I am
4 asking you necessary to do what?
5    A.  I was assaulted in prison by prison
6 officials.  I wasn't give the proper care to take
7 care of this.  And it lasted longer than it should
8 have, if you read the doctor's report about
9 shoulders.
10        And certain things have happened to me
11 over this time.  And I am still here dealing with it
12 today.  I am still going to therapy today to get
13 this shoulder right.
14    Q.  Well, I don't think you're going to answer
15 the question, but I'm not going to beat you up too
16 bad about it.
17    MR. TAYLOR:  I will turn you over to Abigail to
18 see if she has any other questions.
19        REDIRECT EXAMINATION
20        BY MS. DeHART:
21    Q.  Mr. Long, not necessarily about more
22 testimony.  I want to make sure on our end you had
23 mentioned not receiving documents from us in
24 December.

Page 100

1        I took over this case from prior
2 counsel, and they were sent to you.  I want to make
3 sure that you do have them.  If not, I could resend
4 them just because I won't have a chance to talk to
5 you.
6    A.  I have documents?  You all said you sent
7 them to me.  I have not seen them today.  I even
8 compelled to have them, and you said the compel was
9 not relevant because you sent them to me.
10        I do not have -- none of this stuff is
11 sitting here but discovery from the defendants.
12    Q.  Mr. Long, on our end we could resend them.
13 I was told they were sent to you, and I think they
14 were.  I will resend them to you.
15        We could take care of that.  So this
16 would be from the IDOC defendants and bates numbers
17 1 through 527.  I will resend them to you as of
18 today.
19    A.  Yes, ma'am.  I appreciate that.
20    Q.  And I think that is really all I have on
21 my end.
22        So just to wrap up, have you testified
23 today about everything that you remember as to the
24 allegations in this complaint?

Page 101

1    A.  Everything that I can remember.  I tried
2 to do it as truthful as possible.  Like I said again
3 like I told Mr. Taylor, I brought everything over
4 with me today.
5        If I am not able to look at it how can I
6 tell you exactly what you're asking?
7    Q.  Understood.
8    A.  I have dates and all of that right here
9 sitting in front of me.
10    Q.  Understood.  I know depositions are a bit
11 strange that we are asking you what you recall
12 because we have the documents.
13        So there's not any other statements or
14 facts about the allegations that you haven't told us
15 at this deposition?
16    A.  No.
17    MS. DeHART:  What's going to happen now is you
18 could either waive your signature or reserve your
19 signature.  If you waive it, then you are trusting
20 the court reporter has taken down everything
21 accurately.
22        If you reserve signature, then you get a
23 chance to review the transcript to make sure that
24 everything is correct.  Mainly like all names are

26 (Pages 98 - 101)

Page 102

1 spelled correctly. You cannot keep a copy or change
2 your testimony if you reserve signature.
3      So what would you like to do, waive or
4 reserve signature?
5      THE WITNESS: The same thing I told Mr. Taylor.
6 If I could tell you what I got right here which you
7 say you all have, what's the point of me bringing it
8 over if I can't use it. It's like you're trying to
9 trip me up, and I don't like that.
10      I don't need to be put in that situation, and
11 I know how lawyers are. And I'm not going to be put
12 in that situation because this is too important to
13 be sitting up here playing games, asking me
14 something later on to trip me up.
15      That's not going to work. I'm going to ask
16 the judge to take a look at what Mr. Taylor was
17 doing. I'm going to do that.
18      MS. DeHART: Mr. Long, my only question is
19 whether you would like to waive or reserve
20 signature. So this is just you would get a chance
21 to review. In my experience it's usually all fine.
22 Maybe there was a misspelling as to your name you
23 want to fix. That is all I'm asking.
24      If you waive signature, then we're done here.

Page 103

1 You can reserve and review the transcripts. Like I
2 said you don't get to keep a copy, but you review it
3 to make sure spellings are correct. So what would
4 you like to do, waive or reserve?
5      THE WITNESS: Whatever is good for you.
6      MS. DeHART: This is totally up to you. It's
7 your testimony and transcript. This is not us
8 trying to trick you. This is a standard deposition
9 procedure.
10      THE WITNESS: I will sign for it.
11      MS. DeHART: You would like to waive your
12 signature?
13      THE WITNESS: No, I will sign for it. If I'm
14 going to get a copy to review it, I would like to
15 have that.
16      MS. DeHART: That makes sense. So you will
17 reserve signature.
18
19
20
21
22
23
24

Page 104

1 STATE OF ILLINOIS  )
2           ) ss:
3 COUNTY OF C O O K  )
4
5      I, VICTORIA D. ROCKS, C.S.R., Notary
6 Public, within and for the County of Cook, State of
7 Illinois, a Certified Shorthand Reporter of said
8 state, do hereby certify:
9      That previous the commencement of the
10 examination of the witness, DWIGHT LONG, was first
11 duly sworn to testify to the whole truth concerning
12 the matters herein;
13      That the foregoing deposition
14 transcript was reported stenographically by me and
15 was thereafter reduced to typewriting via
16 computer-aided transcription under my personal
17 direction, and constitutes a true record of the
18 testimony given and the proceedings had;
19      That the said deposition was taken
20 before me at the time and place specified;
21      That the reading and signing by the
22 witness of the deposition transcript was not
23 waived;
24      That I am not a relative or employee of

Page 105

1 attorney or counsel, nor a relative or employee of
2 such attorney or counsel for any of the parties
3 hereto, nor interested directly or indirectly in the
4 outcome of this action.
5      IN WITNESS WHEREOF, I do hereunto set
6 my hand and affix my seal of office at Chicago,
7 Illinois this 10th day of March, 2021.
8
9      *Victoria Rocks*
     _____
10      VICTORIA D. ROCKS, C.S.R.
           License No. 084-002692
11
12
13
14
15
16
17
18
19
20
21
22
23
24

27 (Pages 102 - 105)

**Page 106**

1        Veritext Legal Solutions

         1100 Superior Ave

2            Suite 1820

         Cleveland, Ohio 44114

3        Phone: 216-523-1313

4  MARCH 15, 2021

5  MR. DWIGHT LONG

6  Case Name: Long, Dwight v. Martin, Terry Et Al

7  Veritext Reference Number: 4443831

8  Deposition Date:  2/22/2021

9  Dear Sir/Madam:

10 Enclosed you will find a transcript of your deposition.

11 As the reading and signing have not been expressly

12 waived, please review the transcript and note any

13 changes or corrections on the errata sheet

14 included, indicating the page, line number, change and

15 reason for the change. Sign at the bottom of the sheet

16 in the presence of a notary and forward the errata sheet

17 back to us at the address shown above or email to

18 production-midwest@veritext.com.

19 If the errata is not returned within thirty days of your receipt of

20 this letter, the reading and signing will be deemed waived.

21 Sincerely,

22 Production Department

23

24 NO NOTARY REQUIRED IN CA

---

**Page 107**

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS

2

   ASSIGNMENT REFERENCE NO: 4443831

3  CASE NAME: Long, Dwight v. Martin, Terry Et Al
   DATE OF DEPOSITION: 2/22/2021

4  WITNESS' NAME: Dwight Long

5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript

6  of my testimony or it has been read to me.

7       I have made no changes to the testimony
   as transcribed by the court reporter.

8  _____

9  Date              Dwight Long

10      Sworn to and subscribed before me, a
   Notary Public in and for the State and County,

11 the referenced witness did personally appear
   and acknowledge that:

12

   They have read the transcript;

13 They signed the foregoing Sworn
   Statement; and

14 Their execution of this Statement is of
   their free act and deed.

15

   I have affixed my name and official seal

16 this _____ day of_____, 20____.

17                    _____

18                    Notary Public

19                    _____

20                    Commission Expiration Date

21

22

23

24

25

---

**Page 108**

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS

2

   ASSIGNMENT REFERENCE NO: 4443831

3  CASE NAME: Long, Dwight v. Martin, Terry Et Al
   DATE OF DEPOSITION: 2/22/2021

4  WITNESS' NAME: Dwight Long

5       In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of

6  my testimony or it has been read to me.

7       I have listed my changes on the attached
   Errata Sheet, listing page and line numbers as

8  well as the reason(s) for the change(s).

9       I request that these changes be entered
   as part of the record of my testimony.

10

   I have executed the Errata Sheet, as well

11 as this Certificate, and request and authorize
   that both be appended to the transcript of my

12 testimony and be incorporated therein.

13 _____

   Date         Dwight Long

14

   Sworn to and subscribed before me, a

15 Notary Public in and for the State and County,
   the referenced witness did personally appear

16 and acknowledge that:

17    They have read the transcript;
      They have listed all of their corrections

18    in the appended Errata Sheet;
      They signed the foregoing Sworn

19    Statement; and
      Their execution of this Statement is of

20    their free act and deed.

21 I have affixed my name and official seal

22 this _____ day of_____, 20____.

23 _____

   Notary Public

24 _____

25 Commission Expiration Date

---

**Page 109**

1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST

2        ASSIGNMENT NO: 4443831

3  PAGE/LINE(S) /        CHANGE        /REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19

   _____

20 Date           Dwight Long

21 SUBSCRIBED AND SWORN TO BEFORE ME THIS _____

22 DAY OF _____, 20_____ .

23 _____

   Notary Public

24

   _____

25 Commission Expiration Date

28 (Pages 106 - 109)