E-FILED
Monday, 31 January, 2022  12:31:11 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS

DWIGHT LONG,                          )
                                      )
    Plaintiff,                )
                                      )
    v.                        )          19-CV-3195
                                      )
TERRY MARTIN, et al.,                 )
                                      )
    Defendants.               )

## ORDER

**COLIN STIRLING BRUCE, U.S. DISTRICT JUDGE.**

Plaintiff proceeds pro se from his incarceration in Pinckneyville Correctional Center on the following Eighth Amendment claims, which arose during Plaintiff's incarceration in Graham Correctional Center: (1) excessive force claim against Defendant Martin; and, (2) claim for deliberate indifference to Plaintiff's serious medical needs against Defendants Martin, Barbee, Dr. Kayira, and Director of Nursing Howard.

Before the Court are Defendants' motions for summary judgment. For the reasons explained below, summary judgment is granted to Defendants on Plaintiff's claims regarding his medical

treatment.  Summary judgment is denied as to the excessive force claim against Defendant Martin.

## Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward with sufficient evidence to create genuine issues of material fact to avoid summary judgment."  McAllister v. Price, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, the evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant.  Id.

# Analysis

## I. Medical Treatment

Deliberate indifference to a serious medical need violates an inmate's Eighth Amendment right to be free from cruel and unusual punishment.  <u>Townsend v. Cooper</u>, 759 F.3d 678, 689  (7th Cir. 2014).  A rational juror could conclude that Plaintiff's urinary and shoulder problems were serious medical needs, so the focus is on whether Defendants were deliberately indifferent to those needs.

Deliberate indifference is the conscious disregard of a substantial risk of serious harm.  <u>Lockett v. Bonson</u>, 937 F.3d 1016, 1023 (7th Cir. 2019).  A doctor exercising his or her professional judgment is not deliberately indifferent.  <u>Stewart v. Wexford Health Sources, Inc.</u>, 14 Fed.4th 757, 763 (7th Cir. 2021)("In the case of a claim of deliberate indifference against a medical professional, a prisoner must demonstrate that the medical professional's response was 'so inadequate that it demonstrated an absence of professional judgment.'")(*quoted cite omitted*); <u>Sain v. Wood</u>, 512 F.3d 886, 894-95 (7th Cir. 2009)("A medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those

circumstances.")  "[Deliberate indifference] is 'essentially a criminal recklessness standard.'" <u>Davis v. Kayira</u>, 938 F.3d 910 915 (7th Cir. 2019)(quoted cite omitted).

### A.  Urinary Issues

Defendants first assert that Plaintiff filed this claim outside the two-year statute of limitations.  Plaintiff does not dispute that his urinary issues were resolved by April 25, 2017, which arguably started the statute of limitations running.  The statute tolls while grievances wend their way through the grievance procedure. Defendants argue that Plaintiff's last grievance on this claim received a final ruling by the Administrative Review Board on July 26, 2017.  If that is accurate, the statute of limitations would have arguably started running again on or around July 26, 2017, and ending on or around July 26, 2019.  Plaintiff's complaint in this action is dated August 1, 2019 and was postmarked August 9, 2019.

However, the cite provided by Defendants to establish the date of the Administrative Review Board's ruling is not a decision by the Administrative Review Board.  [Dr. Kayira's Mot. Summ. J., Exhibit C, page 103.]  It is a handwritten note which states, "Grievance to:

Dan Wilson, Counselor." Additionally, Plaintiff maintains that he did not receive a decision from the Administrative Review Board. On this record, the Court cannot tell when Plaintiff received a ruling from the Administrative Review Board and so cannot tell when the tolling stopped. Generally, the Administrative Review Board has six months to rule on appeals, 20 Ill.Admin.Code 504.850(e), which would have tolled the statute of limitations into January 2018 if the appeal was received in July 2017 and no decision was rendered. That would arguably make the statute of limitations run in January 2020.

Dr. Kayira argues that, even if Plaintiff timely filed his complaint, Dr. Kayira was dismissed in the Court's merit review order for failure to state a claim and did not learn of this case until the Court granted Plaintiff leave to file an amended complaint, adding back Dr. Kayira and other originally named defendants. However, Plaintiff's motion for leave to file an amended complaint [21] can be fairly construed as a motion to reconsider the Court's dismissal of Dr. Kayira in the merit review order. Dr. Kayira does not address how a court's sua sponte dismissal of a named defendant by a court before service affects the relation back

doctrine.  Additionally, Dr. Kayira does not address if the statute of limitations also tolled while Plaintiff waited for the Court to conduct a merit review on the original complaint and serve the defendants. On this record, at least, Defendants have not met their burden of demonstrating that Plaintiff's claims about his urinary issues are barred by the statute of limitations.

That does not get Plaintiff far, however, because no reasonable jury could conclude that Defendants were deliberately indifferent to Plaintiff's urinary issues.  The undisputed facts show that Plaintiff noticed blood in his urine on or around October 24, 2016.  Within the next few days, Defendant Dr. Kayira ordered labs, consulted a urologist, and sent Plaintiff to the hospital.  [Dr. Kayira's Undisp. Facts 26, 27, 30, 31.]  Tests were run at the hospital (abdominal X-ray and CT scans) which showed no abnormalities except for a renal cyst and an enlarged prostate. Plaintiff was discharged back to Graham Correctional Center the same day with instructions to see a urologist in one week.  [Dr. Kayira's Undisp. Facts 33, 34.]

After Plaintiff returned from the hospital, Dr. Kayira prescribed Plaintiff Bactrim to address the possibility that Plaintiff

had a urinary infection, even though Plaintiff's hematuria had stopped.  Dr. Kayira also referred Plaintiff to a urologist. Plaintiff maintains that the Bactrim caused Plaintiff's hematuria to return. After Plaintiff reported the hematuria to a nurse, Dr. Kayira substituted a different antibiotic for the Bactrim.  [Dr. Kayira's Undisp. Facts 33, 34.]

The urologist, Dr. Nayak, saw Plaintiff on November 7, 2016 and recommended a cystoscopy and a prostate-specific antigen test. Dr. Nayak performed the cystoscopy on December 9, 2016.  Dr. Nayak "identified a bladder neck mass and recommended cysto/bilateral retrograde pyelogram/bladder neck resection."  [Dr. Kayira's Undisp. Facts 41, 49.]  This surgery occurred on January 11, 2017.  [Dr. Kayira's Undisp. Facts 51.]

Unfortunately, the surgery did not solve the problem and Plaintiff would continue to have problems with urinating blood until late April 2017.  Plaintiff reported blood in his urine on January 25, 2017 and was again taken to the hospital.  Plaintiff was kept in the hospital overnight for observation and discharged the next day with a Foley catheter.  The catheter was removed on February 1, 2017. [Dr. Kayira's Undisp. Facts 59-64.]

Plaintiff reported hematuria on February 8, 2017, and Plaintiff was sent for the third time to a hospital emergency room. Another cystoscopy was performed, as well as "clot evacuation and fulguration of bleeders" to cauterize and destroy abnormal tissue. [Dr. Kayira's Undisp. Fact 68.]  Plaintiff had a follow-up appointment in February with a urologist other than Dr. Nayak, and Dr. Kayira ordered the tests recommended by the urologist. [Dr. Kayira's Undisp. Facts 72-74.]

On March 24, 2017, Plaintiff reported pain while urinating. Dr. Kayira ordered a urine culture and contacted Dr. Nayak, who saw Plaintiff on March 27, 2017.  Dr. Nayak prescribed a bladder relaxant and an analgesic, but those did not help.  Dr. Nayak then recommended that Plaintiff insert 2% lidocaine gel into Plaintiff's urethra by himself to relieve pain. [Dr. Kayira's Undisp. Fact 18.] Plaintiff was unable to insert the medicine because, according to Plaintiff, his urethra was blocked.  On April 16, 2017, Plaintiff asked that a catheter be placed.  Healthcare staff tried but were unable to do so because of resistance in Plaintiff's urethra.  [Dr. Kayira's Undisp. Facts 88, 89.]  Plaintiff was kept in the health care unit overnight and taken to see a urologist the next day.  The

urologist performed another cystoscopy and saw an "abnormal narrowing of the opening of the urethra at the external meatus of the penis." The urologist recommended that Plaintiff receive another "cystoscopy, urethral dilation, and possible trans-urethral resection of the prostate to be performed on an outpatient basis at a future date." [Dr. Kayira's Undisp. Fact 91; Ex. A to Dr. Kayira's Mot. Summ. J. Bates 832.]

On April 19, 2017, Plaintiff asserts that he was in "severe abdomen and penis pain" and was taken in a wheelchair to the health care unit at around 10:00 a.m. What happened next is disputed. Defendants maintain that Plaintiff angrily walked out "with an erect posture and steady gait" after being told Plaintiff would need to wait until his appointment at 12:30 p.m. that day with Dr. Kayira. According to Defendants, Plaintiff was verbally abusive and stalked off. Defendants content that Plaintiff was then found lying on the ground outside the health care unit, in no apparent distress, and was helped into a wheelchair without incident, but again stalked off when told again he would need to wait for his appointment time. [Dr. Kayira's Undisp. Facts 93, 94, 95.]

Plaintiff, on the other hand, maintains that he presented to the health care unit in great pain, and the staff were rude, refusing to help.  Plaintiff asserts that he walked out and then fell or fainted because of the pain.  He maintains that he could not follow Defendant Martin's orders to get into the wheelchair and that Defendant Martin picked Plaintiff off the floor and "body-slammed" Plaintiff into the wheelchair, injuring Plaintiff's shoulder.

The parties agree that Plaintiff saw Dr. Kayira the same day, after this incident.  Dr. Kayira prescribed pain medicine and an antibiotic and admitted Plaintiff to the prison infirmary, where Plaintiff was observed until he had an appointment with Dr. Nayak on April 25, 2017.  Dr. Nayak performed "a cystourethral dilatation, external Otis urethrotomy, and dilatation to address Plaintiff's meatal stricture."  [Dr. Kayira's Undisp. Fact 99.]  Plaintiff was discharged back to the prison the same day.  Plaintiff agrees that he has had no recurrences of hematuria or dysuria since the procedure on April 25, 2017.

No reasonable juror could find from these facts that Defendants were deliberately indifferent to Plaintiff's urinary issues. Plaintiff was seen by urologists multiple times and had multiple

tests and surgical procedures.  Dr. Kayira took Plaintiff's complaints seriously, responded promptly and appropriately, and followed the urologists' recommendations.  Plaintiff disputes this but he offers no admissible evidence otherwise.  That it took several months for the urologists to figure out and fix the problem is not evidence that the urologists' approach was outside the standard of care, much less that Dr. Kayira might have reason to think so. Sanville v. McCaughtry, 266 F.3d 724, 736 (7th Cir. 2001) ("[P]hysicians do not practice with a crystal ball in hand."); Duckworth v. Ahmad, 532 F.3d 675, 681 (7th Cir. 2008)(no deliberate indifference where doctor "tried to cure what he thought was wrong . . ., an opinion he arrived at using medical judgment.").

Plaintiff argues in conclusory fashion that there were unacceptable delays, but he offers no evidence that any of the appointments could have or should have occurred sooner or that any of Defendants had anything to do with the scheduling.  Plaintiff also maintains that he continued urinating blood because prostate medicines recommended by Dr. Nayak were denied, but again Plaintiff cites to no admissible evidence that he was denied any medically necessary medication, much less that any Defendant was

involved in that denial.  In short, Plaintiff's allegations remain just allegations.

Defendants Martin and Barbee allegedly refused Plaintiff immediate medical care on April 19, 2017, leading to the incident in which Plaintiff claims that Defendant Martin body-slammed Plaintiff into the wheelchair.  However, Plaintiff offers no evidence that Defendants Martin and Barbee were aware that Plaintiff had a medical need so urgent that Plaintiff could not wait a few hours for his scheduled appointment with Dr. Kayira.  Plaintiff saw Dr. Kayira a few hours later and no additional treatment was provided except for Plaintiff being placed in the prison infirmary for observation until Plaintiff's appointment with Dr. Nayak a six days later.

## B.  Right Shoulder Issues

Medical records from the year 2014 reflect that Plaintiff reported bilateral shoulder pain, including trauma and dislocation, and had received physical therapy for that problem.  [Ex. A to Dr. Kayira's Mot. Summ. J. pp. 66, 84, 97, 103-111.]  Plaintiff insists that he had no shoulder problems at all until Defendant Martin allegedly slammed Plaintiff into a wheelchair on April 19, 2017.

Plaintiff asserts that the medical records are concocted or altered, but no evidence supports that speculation.

Regardless of what happened in 2014, on May 5, 2017, about two weeks after allegedly being slammed into a wheelchair by Defendant Martin on April 19, 2017, Plaintiff presented to Dr. Kayira with right shoulder and lower back pain.  X-rays showed mild to moderate osteoarthritis of Plaintiff's shoulder joints and mild degenerative disc disease in Plaintiff's lower spine.  [Def. Dr. Kayira's Undisp. Facts 110, 112.].  Dr. Kayira prescribed Naproxen for pain and, the next month, referred Plaintiff for physical therapy. Plaintiff saw the physical therapist in July 2017, who recommended an exercise program which Plaintiff performed in the prison health care unit.   [Def. Dr. Kayira's Undisp. Facts 120-123.]  According to the medical records, Plaintiff reported an improvement, but Plaintiff denies any improvement.

On February 2, 2018, Dr. Kayira ordered another x-ray after Plaintiff still complained about pain in Plaintiff's right shoulder. The parties dispute whether Plaintiff told Dr. Kayira that Plaintiff was lifting weights, but the dispute is immaterial.  The x-ray showed progression of Plaintiff's osteoarthritis and a "Hill-Sachs

deformity of the glenohumeral head," which makes a shoulder susceptible to dislocations.  [Def. Dr. Kayira's Undisp. Facts 128-130.]  In April 2018, Dr. Kayira referred Plaintiff to an orthopedic surgeon and prescribed a muscle relaxant (Robaxin) in May .  [Def. Dr. Kayira's Undisp. Facts 131, 135.]

An MRI of Plaintiff's shoulder was done in June 2018, which showed a biceps tear and labral tearing.  Dr. El Bitar, an orthopedic surgeon, concluded "[t]he main problem in this patient's shoulder is arthritis of the glenohumeral joint.  The patient should continue conservative treatment as long as he can.  If he continues to have pain, then he might benefit from shoulder replacement surgery." [Ex. C to IDOC's Mot. Summ. J., 6/20/18 review of MRI by Dr. El Bitar.]  Depending on the severity of a labral tear, rest and physical therapy might be enough, or surgery might be necessary.  A biceps tear is usually treated conservatively.  [Dr. Kayira's Undisp. Facts 141-143.]

The next month, Plaintiff reported to Dr. Kayira that Plaintiff still had intolerable pain.  Dr. Kayira prescribed Tramadol and referred Plaintiff back to the orthopedic office.  In September 2018, Plaintiff saw an orthopedic surgeon who recommended that Plaintiff

continue to work on range of motion exercises and return in four weeks.  [Ex. A to Def. Dr. Kayira's Mot. Summ. J., Bates 898.]

Plaintiff returned to the orthopedic center in November 2018. Plaintiff reported no improvement, and arthroscopic surgery was recommended.  [Ex. A to Def. Dr. Kayira's Mot. Summ. J., Bates 932, 933.]  Plaintiff had the surgery on November 19, 2018.  The surgeon recommended Norco for pain, but Dr. Kayira instead prescribed Tylenol #3, which, according to Dr. Kayira, studies show is equally as effective as Norco in this situation.  [Dr. Kayira Aff. ¶ 121.]  Plaintiff received instructions on physical therapy exercises.

A little over the year after the shoulder surgery, Plaintiff reported numbness and tingling in his right shoulder.  Dr. Kayira orders x-rays and prescribed Robaxin and Nortriptyline.  [Dr. Kayira's Undisp. Fact 160.]  In February 2020, Dr. Kayira referred Plaintiff to the orthopedist.  Plaintiff's original March 2020 appointment was cancelled when the orthopedist office cancelled all appointments because of an illness outbreak.  When appointments resumed, an orthopedic surgeon saw Plaintiff on June 17, 2020, and recommended shoulder replacement surgery.  Plaintiff saw another orthopedic surgeon in July 2020, who instead

recommended conservative treatment and Meloxicam, with a follow-up in one month.  Another try with conservative treatment did not help, and, in September 2020, the surgeon recommended a right reverse total shoulder replacement.  The surgery was performed in November 2020.  [Dr. Kayira's Undisp. Facts 164-171, 177.]

As with Plaintiff's urinary issues, no reasonable juror could find on these facts that Defendants were deliberately indifferent to Plaintiff's should condition.  Plaintiff argues that all the treatment efforts leading up to the shoulder replacement surgery did not help, but that is not the question.  The question is whether Dr. Kayira's treatment decisions were such a substantial departure from accepted standards that those decisions were not based on professional judgment at all.  <u>Roe v. Elyea</u>, 631 F.3d 843, 857 (7th Cir. 2011).  Dr. Kayira referred Plaintiff to specialists and followed those specialists' recommendations.  Even the specialists recommended trying conservative treatment for a longer time before resorting to surgery.

Plaintiff asserts that the surgeons told Plaintiff early on that Plaintiff needed shoulder replacement surgery and expressed displeasure with the care Plaintiff had been receiving in the prison,

but those purported statements are inadmissible hearsay and directly contradict the written recommendations on which Dr. Kayira was entitled to rely.  Plaintiff also asserts that the specialists' recommendations were not followed, but the assertion is conclusory with no cite to admissible evidence.  As with Plaintiff's urinary issues, Plaintiff's allegations about his shoulder treatment remain just allegations.

In addition to Plaintiff's shoulder pain, Plaintiff also reported back pain.  Plaintiff asserts that his back pain has not been addressed, but that conclusion is not supported by any evidence. Dr. Kayira diagnosed mild disc disease through an x-ray and prescribed pain medicine.  Plaintiff does not explain how that approach was improper.  Summary judgment is granted to Defendants on Plaintiff's claims for deliberate indifference to his serious medical needs.

## II.  Excessive Force Claim Against Defendant Martin

Plaintiff contends that he was transported by wheelchair in severe pain to the healthcare unit on April 19, 2019, where he maintains Defendants Barbee and Martin berated Plaintiff for complaining.  Plaintiff states that he walked out of the health care

unit (apparently no longer needing the wheelchair) and fell.
Defendant Martin said, "Get the fuck of the ground," according to
Plaintiff.  Plaintiff asserts that he responded that he was unable to
get up, whereupon Defendant Martin allegedly picked Plaintiff off
the ground and body-slammed Plaintiff into the wheelchair with
Defendant Martin's full body weight.  This is when Plaintiff's
shoulder pain and problems began, according to Plaintiff.

   Defendant Martin argues that Plaintiff's excessive force claim is
barred because Plaintiff received discipline for insolence and
disobeying a direct order based on the incident.  According to the
disciplinary findings, Plaintiff was verbally abusive, demanding
immediate care and refusing to follow orders to be quiet and leave.
Defendant Martin maintains that Plaintiff lost good time on this
disciplinary ticket, which would bar Plaintiff from challenging the
factual findings of the disciplinary ticket.  Edwards v. Balisok, 520
U.S. 641, 648 (1997)(claims which  "necessarily imply the invalidity
of the deprivation of  . . . [an inmate's] good-time credits" are not
cognizable under 42 U.S.C. § 1983 until the prison disciplinary
decision has otherwise been invalidated).

However, Defendant Martin does not cite to any document which reflects that Plaintiff lost good time.  The disciplinary decision states that Plaintiff's punishment was only one month of grade demotion, and Plaintiff denies that he lost good time.  [4/22/17 Final Summary Report, IDOC 70.]  Defendant Martin has not shown that Plaintiff lost good time.  Therefore, Plaintiff's excessive force claim is not an indirect challenge to the length of Plaintiff's sentence and is not barred.

Alternatively, Defendant Martin argues that nothing in the records supports an inference that he used force maliciously and sadistically for the purpose of causing harm rather than in a good faith effort to restore order.  Sanchez v. City of Chicago, 700 F.3d 919, 927 n. 3 (7th Cir. 2012) ("Excessive force in this context means the 'unnecessary and wanton infliction of pain,' which is force applied 'maliciously and sadistically for the very purpose of causing harm' rather than force applied in a 'good faith effort to maintain or restore discipline.'" )(quoted and other cite omitted).  The Court must accept Plaintiff's version of events at this stage, to the extent that version is based on Plaintiff's personal knowledge.  Plaintiff's own description of the force he experienced and Defendant Martin's

comments allows a reasonable inference that Defendant Martin was angry and used excessive force for the purpose of harming Plaintiff. While Plaintiff offers no admissible evidence to support his conclusion that the alleged excessive force cause the labral and biceps tears, Plaintiff can still testify to the pain and difficulty functioning he experienced after the incident.

This case will, therefore, proceed to trial against Defendant Martin on the excessive force claim.  Costs of suit will be assessed against the losing party pursuant to Federal Rule of Civil Procedure 54.

**IT IS THEREFORE ORDERED:**

1)     Defendant Dr. Kayira's motion for summary judgment is granted.  [50.]

2)     The motion for summary judgment by Defendants Barbee, Howard, and Martin is granted in part and denied in part. [52.]  Summary judgment is denied on Plaintiff's excessive force claim against Defendant Martin.  Summary judgment is otherwise granted.

3)     The clerk is directed to terminate Defendants Kayira, Barbee, and Howard.

4)     A status conference is set by telephone for Friday,

February 11, 2022 at 1:00 p.m. to schedule the final pretrial

conference and trial.  Counsel may join the conference by calling

551-285-1373 and then enter meeting ID 16051789866.

5)     **The clerk is directed to issue a telephone writ to**

**secure Plaintiff's presence at the status conference.**

ENTERED: 1/31/2022
FOR THE COURT:

**_s/Colin Stirling Bruce_**
COLIN STIRLING BRUCE
UNITED STATES DISTRICT JUDGE